Edward SOLDAL, et al., Plaintiffs–Appellants,

v.

COUNTY OF COOK, et al., Defendants–Appellees.

No. 89–3631.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 14, 1990.

Decided Jan. 24, 1991.

Reheard En Banc June 11, 1991.

Decided Aug. 27, 1991.

John L. Stainthorp (argued), Peoples Law Office, Chicago, Ill., for plaintiffs-appellants Edward Soldal and Mary Soldal, individually and as legal guardians.

Madeleine S. Murphy, Asst. State Atty., Randolph M. Johnston (argued), Office of State's Atty. of Cook County, Chicago, Ill., for defendants-appellees County of Cook, Lt. Jones, Officer Haritos, Officer Hunt, Officer Vaid, Captain Jackson, Captain Levy and Chief Wittsman.

Randolph M. Johnston, Office of State's Atty. of Cook County, Chicago, Ill., for defendants-appellees Officer Doe and Officer Poe.

Randolph M. Johnston, Office of State's Atty. of Cook County, Chicago, Ill., John C. Vojta, Vojta & Lagattuta, Schaumburg, Ill., for defendants-appellees Jeffrey Peterson, Kimberly Giovanni, and Margaret Celeski.

Randolph M. Johnston, Office of State's Atty. of Cook County, John J. George, Dennis J. Aukstik (argued), Robert T. Oleszkiewicz, Daley & George, Chicago, Ill., for defendants-appellees Margaret Hale and Terrace Properties.

Before BAUER, Chief Judge, and CUMMINGS, WOOD, Jr., CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION and KANNE, Circuit Judges.

POSNER, Circuit Judge.

We granted rehearing en banc to consider the applicability of the Fourth Amendment, which forbids unreasonable searches and seizures, to the removal of a mobile home from a trailer park. The three-judge panel that first heard the appeal held by a divided vote that the removal was not within the scope of the Fourth Amendment. 923 F.2d 1241, 1249–50 (7th Cir.1991). The full court adheres to this conclusion but has decided to elaborate its grounds. This opinion supersedes the panel's discussion of the Fourth Amendment, but in all other respects the panel opinion is reinstated.

Edward Soldal lived with his wife and four children in a trailer home, which he owned, situated on a rented lot in a trailer park in Elk Grove, Illinois. The owner of the trailer park, Terrace Properties, decided to evict the Soldals, and sued in an Illinois state court for an eviction order. Two weeks *before* the court hearing, Terrace Properties decided to go ahead and evict the Soldals forcibly. Anticipating the possibility of resistance, Margaret Hale, the manager of the trailer park, notified the Cook County sheriff's office; and when two employees of Terrace Properties showed up at the Soldals' trailer home to remove it, they were accompanied by a Cook County deputy sheriff, who told Soldal that he was there to prevent him from interfering with the eviction. Other deputy sheriffs were also at the scene to ensure that the eviction proceeded without interruption. In removing the sewer and water boxes from the side of the trailer home, the employees damaged the home. When they finished disconnecting the home from the utilities, they towed it off the lot and out of the trailer park. The eviction violated Illinois law, because no court order authorizing it had yet been issued—none ever *was* issued.

The Soldals' suit is against Terrace Properties and Mrs. Hale as well as against the deputy sheriffs, and is brought under 42 U.S.C. § 1983, which provides a civil remedy for the deprivation of federal rights by persons acting under color of state law. An initial problem in such a case, from a plaintiff's standpoint, is how to bring *private* defendants under the rubric of persons acting under color of *state* law, a category normally reserved for state and municipal employees. Had the private defendants in this case, Terrace Properties and Mrs. Hale, been acting pursuant to a court order when they had the trailer home removed, this might have made their action

state action. *Del's Big Saver Foods, Inc. v. Carpenter Cook, Inc.*, 795 F.2d 1344, 1346 (7th Cir.1986); cf. *Edmonson v. Leesville Concrete Co.*, — U.S. —, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). But they were not; and the action of a private person in enforcing rights conferred on him by state law is not deemed state action. *Id.* 111 S.Ct. at 2083; *Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, 485, 108 S.Ct. 1340, 1345, 99 L.Ed.2d 565 (1988); *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 164–65, 98 S.Ct. 1729, 1737–38, 56 L.Ed.2d 185 (1978). Otherwise everything would be state action, since what law does not forbid it permits.

■ As for the public defendants in this case—the deputy sheriffs (county police)—the mere presence of police at the scene of a private act (here, the eviction of the Soldals by Terrace's employees) *in which they do not participate* does not transform the private act into a public one. *Gramenos v. Jewel Cos.*, 797 F.2d 432, 435 (7th Cir.1986). But there was more here. The eviction was unlawful, and Soldal had a common law right to resist it forcibly, although his right was limited to using mild force. The deputy sheriffs prevented Soldal from exercising his right, and while this by itself may not have made them actual participants in the eviction, the condition of the record (the case was dismissed on summary judgment) requires us, as the panel opinion explained, to assume that there was a conspiracy between the private and the public defendants—that the deputy sheriffs joined Terrace Properties in a scheme to get rid of a pesky tenant, a troublemaker. 923 F.2d at 1247–48. If so, it is as if the deputy sheriffs themselves seized the trailer, disconnected it from the utilities, and towed it away. Equivalently it is as if they had deputized the private defendants to assist them. Thus, on the state of the record, we must regard *all* of the defendants as having acted under color of state law.

This frames the question that we granted rehearing en banc to decide: If police officers disconnect and tow away a trailer home, can their action be challenged under the Fourth Amendment as an unreasonable

seizure? The question is of surprising novelty, and its implications for other forms of eviction and even perhaps for the repossession of automobiles and other personal property make it of potentially far-reaching practical significance. The history of the question in the courts can be recounted briefly. The question was left open in *Fuentes v. Shevin*, 407 U.S. 67, 96 n. 32, 92 S.Ct. 1983, 2002 n. 32, 32 L.Ed.2d 556 (1972). A glancing reference in *Tavarez v. O'Malley*, 826 F.2d 671, 678 (7th Cir.1987), expressed the skepticism of three members of this court. The Third Circuit gave a peremptory "no" in *Lebowitz v. Forbes Leasing & Finance Corp.*, 456 F.2d 979, 980 (3d Cir.1972). There is, as we shall see, a Tenth Circuit case that bears closely though not decisively on the issue. The district courts are divided on it. Compare *Dorsey v. Community Stores Corp.*, 346 F.Supp. 103 (E.D.Wis.1972) (3–judge panel), and *Laprease v. Raymours Furniture Co.*, 315 F.Supp. 716, 721–22 (N.D.N.Y.1970) (same), with *McCormick v. First National Bank*, 322 F.Supp. 604 (S.D.Fla.1971).

It is no accident that the question has not arisen more often. The straightforward way for a plaintiff to mount a challenge under section 1983 to an eviction or repossession or other deprivation of property is by claiming that he was deprived of his property without due process of law, as in the *Del's* case cited earlier and a host of other cases. The panel held that the Soldals had abandoned any such claim. 923 F.2d at 1248. They were prudent to do so. In the circumstances of this case they would have faced a distinctly uphill fight to establish it. The Supreme Court has held that the denial of procedural rights (here the rights that Illinois law grants tenants in eviction proceedings) as a result of the random and unauthorized acts of subordinate public officers (the deputy sheriffs in this case) is not actionable under section 1983 unless the plaintiff lacks adequate judicial remedies under state law. *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Zinermon v. Burch*, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); see also *Easter House v. Felder*, 910 F.2d 1387, 1396–97 (7th Cir.1990) (en

banc). Illinois law entitled the Soldals to sue Terrace Properties and Mrs. Hale for the damages caused by the illegal eviction. Ill.Rev.Stat. ch. 80, ¶ 221. The Soldals had an adequate remedy. They failed to use it.

The existence of adequate legal remedies for an illegal eviction such as occurred here—state remedies if they are adequate, a federal remedy under the due process clause if not—is pertinent to deciding whether the Fourth Amendment should be bent to provide the Soldals with still another remedy. Bent it would have to be, because the amendment was never intended to regulate garden-variety commercial disputes of the sort involved in this case. Why bend, when the Soldals had adequate alternatives?

■ The Fourth Amendment regulates both "searches" and "seizures" and it will be helpful to distinguish between the two. Even though we are treating the employees of Terrace who did the actual disconnection and removal as if they had been police officers employed by the State of Illinois, we can hardly construe their conduct as a police *search*. The "officers" did not enter the Soldals' trailer home. They had no interest in what was in it. They were not conducting an investigation or seeking to make an arrest. There was, however, at least in a literal sense, a "seizure" of the home and its contents; and while most seizures that are challenged under the Fourth Amendment are incidental to a search, some are not. The most common seizure challenged under the amendment is an arrest, and it is actionable whether or not it is accompanied by a search.

With only a few exceptions, the seizures held to be forbidden by the Fourth Amendment have been seizures made in the course of public law enforcement—certainly arrests are of that character—rather than repossessions or other seizures made in the course of a dispute between two private parties, even if police officers were assisting the person doing the seizing to the extent of being coconspirators with him. A good example is *Autoworld Specialty Cars, Inc. v. United States*, 815 F.2d 385, 389 (6th Cir.1987), where law-enforcement officers removed vehicles from a dealer's showroom for use in evidence in a criminal prosecution against the dealer. It could indeed be argued on textual and historical grounds that despite its broad wording the Fourth Amendment has no proper application outside the law enforcement context. Not only the second clause of the Fourth Amendment—the clause that places limitations on warrants—but also the background against which the amendment was enacted indicates that the searches and seizures to which the amendment refers are those made for purposes of law enforcement, not those made in connection with private disputes over property rights. Cf. *Wyman v. Jones*, 400 U.S. 309, 317, 91 S.Ct. 381, 385, 27 L.Ed.2d 408 (1971).

But a constitutional provision need not be interpreted so narrowly as to disable it from reaching novel abuses of power. The Fourth Amendment, at least, has not been so interpreted. It has been held to regulate wiretapping and administrative searches, *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), neither a practice with which the framers of the amendment were acquainted. Repossessions and evictions may be far from the core of the Fourth Amendment but we hesitate to suggest that they can never provide the setting for a violation of the amendment. In *Specht v. Jensen*, 832 F.2d 1516 (10th Cir.1987), remanded on unrelated grounds, 853 F.2d 805 (10th Cir. 1988) (en banc), a search of the plaintiff's home by a creditor accompanied by the police was held to violate the Fourth Amendment. We agree with that decision; and it is the closest case to ours. But there is a crucial difference. In *Specht* the conduct of the police invaded an interest that the Fourth Amendment unquestionably protects: the interest in the privacy of the home. (The court in *Specht* emphasized this point. 832 F.2d at 1520.) The invasion was no less extensive, intrusive, or injurious just because the police were assisting a creditor rather than enforcing criminal or other public law.

It might seem, though, that the removal of the trailer home in this case was a "seizure" on the same footing with the "search" of the home in *Specht*. Literally there was a "seizure" here, but to use a literal interpretation of a constitutional provision enacted two centuries ago to make every repossession and eviction with police assistance actionable under—of all things—the Fourth Amendment would both trivialize the amendment and gratuitously shift a large body of routine commercial litigation from the state courts to the federal courts. That trivializing, this shift, can be prevented by recognizing the difference between possessory and privacy interests.

The police did not enter Soldal's trailer home. They did not rummage among his possessions. They did not arrest him (that came later, and is dealt with in an unrelated part of the panel opinion). They did not invade the private "space," for solitude or secrecy, that the Fourth Amendment protects. *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). In that respect this case is like *Cardwell v. Lewis*, 417 U.S. 583, 591, 94 S.Ct. 2464, 2470, 41 L.Ed.2d 325 (1974) (plurality opinion), where "nothing from the interior of the car and no personal effects, which the Fourth Amendment traditionally has been deemed to protect, were searched or seized and introduced in evidence. With the 'search' limited to the examination of the tire on the wheel and the taking of paint scrapings from the exterior of the vehicle left in the public parking lot, we fail to comprehend what expectation of privacy was infringed." (Footnotes omitted.) The police did, of course, take Soldal's home away, and that was a grave deprivation. But it was a deprivation purely of property; there was no invasion of the Soldals' privacy.

Of course this conclusion depends on how broadly or narrowly we define "privacy." Any interference with solitude is an infringement of privacy in a perfectly good sense of the word; thus an unwanted telephone solicitation is an invasion of privacy. And the Supreme Court has often used "privacy" as a synonym for reproductive autonomy. But it would be odd to suggest that a telephone solicitation aimed at selling tickets to the policemen's ball, or a law regulating abortions, invades privacy in a sense *relevant to the Fourth Amendment*. That sense has to do, rather, with the interest in keeping at bay prying ears and prying eyes. It is not invaded by an eviction or repossession; it can be invaded by a search or other entry into the home incident to an eviction or repossession.

In modern law the interests in property and in (Fourth Amendment) privacy are protected by different constitutional provisions and by different bodies of constitutional doctrine. *Hudson v. Palmer*, 468 U.S. 517, 538–40, 104 S.Ct. 3194, 3206–07, 82 L.Ed.2d 393 (1984) (concurring opinion). It is true that the older cases, illustrated by *Olmstead*, often tied the protections of the Fourth Amendment to property concepts, such as trespass. The modern cases, however, well illustrated by *Katz*, which overruled *Olmstead*, refocus the amendment from property to privacy in accordance with Justice Brandeis's dissent in *Olmstead*. This leaves deprivations of property to be regulated by the due process clause (also the takings clause, but that is not involved in this appeal, for reasons explained in the panel opinion, 923 F.2d at 1248–49). We have already noted that in interpreting that clause the Supreme Court has held (with qualifications not relevant to our case) that a person who claims to have been deprived of his property by the state without due process of law must use the judicial remedies that the state has provided for such deprivations. That requirement would be nullified if the property owner could avoid it by recasting his suit as one under the Fourth Amendment rather than under the Fifth (or Fourteenth) Amendment. The elaborate jurisprudence of property deprivations under the due process clause that culminates in *Zinermon v. Burch* would turn out to be a point about pleading.

*Hudson v. Palmer* illustrates the distinction we are making between property and privacy. Prison guards searched the plain-

tiff's cell and seized items of his personal property. This was as much a seizure of property as the removal of the Soldals' trailer. Yet the Supreme Court held that the Fourth Amendment did not apply. It did not apply because, the majority opinion concludes (Justice O'Connor's concurrence is less definite on this point and she was the fifth vote, but she joined Chief Justice Burger's opinion, thus making it a majority opinion), prison inmates have no right of privacy. 468 U.S. at 526–28 and n. 8, 104 S.Ct. at 3200–01 and n. 8. Prison extinguishes that. It does not extinguish property rights, but the Fourth Amendment does not provide a remedy for a pure deprivation of property rights. The remedy in a proper Fourth Amendment case includes the value of any property rights impaired or destroyed—such impairment or destruction is an item of consequential damages in a suit for the violation of the constitutional right. *Taliferro v. Augle*, 757 F.2d 157, 161–62 (7th Cir.1985); *Specht v. Jensen, supra*, 832 F.2d at 1528; *B.C.R. Transport Co. v. Fontaine*, 727 F.2d 7, 12 (1st Cir. 1984); *Marrero v. City of Hialeah*, 625 F.2d 499, 514 (5th Cir.1980). But if the only rights impaired or destroyed are property rights, the case is not actionable under the Fourth Amendment in the first place.

The cases, it is true, distinguish between a "possessory" interest said to be protected against unreasonable "seizure" and a "privacy" interest protected against unreasonable "search." *United States v. Jacobsen*, 466 U.S. 109, 113 and n. 5, 104 S.Ct. 1652, 1656 and n. 5, 80 L.Ed.2d 85 (1984); *Segura v. United States*, 468 U.S. 796, 806, 104 S.Ct. 3380, 3386, 82 L.Ed.2d 599 (1984); *Maryland v. Macon*, 472 U.S. 463, 469, 105 S.Ct. 2778, 2782, 86 L.Ed.2d 370 (1985); *Arizona v. Hicks*, 480 U.S. 321, 324, 107 S.Ct. 1149, 1152, 94 L.Ed.2d 347 (1987); *Horton v. California*, —— U.S. ——, 110 S.Ct. 2301, 2306, 110 L.Ed.2d 112 (1990); see 1 Wayne R. LaFave, *Search and Seizures* § 2.1(a), at pp. 299–300 (2d ed. 1987). Justice Stevens, dissenting in *Hudson v. Palmer*, thought that such decisions required a different result in that case. 468 U.S. at 543–44, 104 S.Ct. at 3209. Obviously the majority disagreed. The path of

reconciliation lies in recognizing that the privacy which the Fourth Amendment protects is the privacy not only of oneself and one's home, as we have thus far been assuming, but also, as the amendment states, of one's "effects." "Effects" are personal property, and are frequently affected with a privacy interest. Just as it is an impairment of privacy to seize one's person (that is, to arrest one), so it can be an impairment of privacy to seize one's personal property. Opening a letter is an obvious example, and it is no accident that the list of protections in the Fourth Amendment includes "papers" as well as persons, houses, and effects. The opening of a package, as in *Jacobsen*, is another example of how a seizure can invade privacy. But not every interference with exclusive dominion and control over one's property is a seizure in the relevant sense because not every such interference compromises privacy. Merely removing luggage from an airport conveyor belt and squeezing it has been held not to be a seizure. *United States v. Lovell*, 849 F.2d 910, 915–16 (5th Cir.1988); *United States v. Garcia*, 849 F.2d 917, 919 (5th Cir.1988); *United States v. Brown*, 884 F.2d 1309, 1311 (9th Cir.1989). See also *Arizona v. Hicks, supra*, 480 U.S. at 324, 107 S.Ct. at 1152; *United States v. Karo*, 468 U.S. 705, 712–13, 104 S.Ct. 3296, 3302, 82 L.Ed.2d 530 (1984). It is different if the police "secure" a residence, that is, take it over, without searching it, while awaiting the arrival of a search warrant. That is a palpable interference with privacy—the police are in the home, looking about—even though it is not a search; it is rightly classified as a Fourth Amendment seizure. *United States v. Lindsey*, 877 F.2d 777, 780 (9th Cir.1989). The physical movement of the Soldals' home—the privacy of its interior uncompromised and unobserved—was not a seizure.

The distinction may seem a fine one. The Fourth Amendment abounds in fine distinctions, perhaps more than are necessary. *California v. Acevedo*, —— U.S. ——, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991). But the particular distinction that we have just elaborated (and that future

cases will no doubt elaborate further) between a Fourth Amendment seizure and other types of interference with property is necessary not only if we are to make sense of *Hudson v. Palmer* but also if the Fourth Amendment is not to swallow the due process clause. If police tow an illegally parked car, without entering or even looking into it, it is a deprivation of property within the meaning of the due process clause, *Sutton v. City of Milwaukee,* 672 F.2d 644 (7th Cir.1982); *Saukstelis v. City of Chicago,* 932 F.2d 1171, 1172 (7th Cir.1991), but is it also a seizure under the Fourth Amendment?

The distinction we are drawing between property and privacy interests in one sense helps explain, and in another sense is thrown into question by, the "plain view" doctrine, that is, the doctrine that if police are lawfully on the premises they can seize contraband or evidence that is in their plain view even if they had gained admittance to the premises without a warrant and without probable cause to believe they would find anything; their presence might, for example, be lawful only because the owner had consented. *Horton v. California, supra; United States v. Cardona–Rivera,* 904 F.2d 1149, 1154–55 (7th Cir.1990); *United States v. Perry,* 815 F.2d 1100, 1105 (7th Cir.1987). There is no incremental invasion of privacy if something is seized that is in, as it were, lawful public view; the thing is no longer private; and the owner's property right is not a Fourth Amendment shield. This point is further illustrated by *GM Leasing Corp. v. United States,* 429 U.S. 338, 351–52, 97 S.Ct. 619, 628, 50 L.Ed.2d 530 (1977), which upheld the Internal Revenue Service's seizure without a warrant of the plaintiff's automobiles because it "took place on public streets, parking lots, or other open places, and did not involve any violation of privacy," but not the seizure of books and records since that "involved intrusion in the privacy of the [plaintiff's] offices." Of similar character are the "open field" cases, such as *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), and *Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). And

see *Autoworld Specialty Cars, Inc. v. United States, supra,* 815 F.2d at 388.

Yet in all these cases the seizure of items that were in the public view, while lawful, was treated as a *Fourth Amendment* seizure, so that it had to be pronounced reasonable (for example because it was consented to, or supported by probable cause, or it seized something that was in plain view) before it could be permitted. The reason, however, is that seizures made in the course of investigations by police or other law enforcement officers are almost always, as in the plain view cases, the culmination of searches. The police search in order to seize, and it is the search *and ensuing seizure* that the Fourth Amendment by its reference to "searches and seizures" seeks to regulate. Seizure means one thing when it is the outcome of a search; it may mean something else when it stands apart from a search or any other investigative activity. The Fourth Amendment may still nominally apply, but, precisely because there is no invasion of privacy, the usual rules do not apply.

There is another reason for distinguishing public law enforcement from other contexts in which seizures may occur, and that is the historical connection between the Fourth Amendment and liberty. The objection to an arrest is not only that it is an invasion of privacy, but also that it is a restriction of liberty. *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). Some property seizures are of this character as well, such as prolonged detention of an individual's luggage at an airport, which by preventing him from continuing on his way curtails his liberty. *United States v. Place,* 462 U.S. 696, 708–09, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983). In none of these cases is the court concerned with property rights as such, although in some of the cases property rights get mentioned in connection with the question of standing to maintain a Fourth Amendment challenge, an issue since laid to rest by *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). Outside of the law enforcement area the Fourth Amendment

retains its force as a protection against searches, because they invade privacy. That is why we decline to confine the amendment to the law enforcement setting. But concerns of liberty will rarely be present outside of that setting and they are not in this case—which because it is a case of seizure, not search, does not involve an invasion of privacy either.

■ Thus, *no* interest protected by the Fourth Amendment is involved, and this helps show that even if, despite what we have said, there is some element or tincture of a Fourth Amendment seizure, it cannot carry the day for the Soldals. *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), establishes the principle that the dominant character of the conduct challenged in a section 1983 case determines the constitutional standard under which it is evaluated. The narrow holding of *Graham* is that when the gist of the challenged conduct is an arrest, the court should use the standards of the Fourth Amendment to adjudge its lawfulness even though the conduct could also be characterized as a deprivation of liberty. But the converse should also be true. If the gist of the challenged conduct is a repossession or eviction conventionally challenged under the due process clause as a deprivation, recharacterization as a Fourth Amendment seizure is barred. The suggestion that *Graham* stands for the proposition that all property disputes should so far as possible be stuffed into the Fourth Amendment strikes us as bizarre.

Mr. Soldal is neither an arrestee (so far as pertinent to this part of the case) nor a prison inmate, but the principles of *Graham v. Connor* and *Hudson v. Palmer* sweep broader than their facts or narrow holdings, and the need to carve the joint between the Fourth Amendment and the due process clause is as urgent in this case as in an arrest case or a prisoner case. The decisions require us to mesh the different provisions in or incorporated by the Fourteenth Amendment while preserving their separate domains—and thus to make the amendment coherent. *Hudson* tells us to do so by allocating the protection of privacy to the Fourth Amendment and the protection of property to the due process clauses of the Fifth and Fourteenth Amendments. *United States v. Janik*, 723 F.2d 537, 547–48 (7th Cir.1983); cf. *United States v. Karo, supra*, 468 U.S. at 713, 104 S.Ct. at 3302. Mr. Soldal lost his property, but not his privacy or his liberty. He has no Fourth Amendment case. He had other legal remedies but he waived them.

The paradox seemingly presented by our decision—that the law-abiding have fewer rights under the Fourth Amendment than the criminal—is superficial. Different constitutional provisions protect different interests. The Fourth Amendment protects privacy, and that interest is more likely to be infringed by criminal investigations than by other governmental activities—though the law-abiding are, occasionally, the inadvertent and, rarely, the intended targets of a criminal investigation, and when they are they receive the full protection of the amendment. The due process clause of the Fifth and Fourteenth Amendments is among the provisions that protect property (though that is not all it protects); and property interests are more likely to be asserted by the law-abiding than by the criminal class. The Soldals, to repeat, had remedies; they chose the wrong one.

For the reasons stated in this and the panel opinion, the judgment of the district court is

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

EASTERBROOK, Circuit Judge, concurring.

One might think from reading the dissenting opinion that we have rejected *Entick v. Carrington*, [1765] 19 Howell's State Trials 1029. Yet everyone agrees that both privacy and possessory interests in a home are substantial and that the Soldals are entitled to damages if their allegations prove true. All the court's opinion, which I join, holds is that this dispute about premature eviction should be handled like other landlord-tenant disputes—in local housing court.

Dragooning such a case into federal court under the aegis of 42 U.S.C. § 1983 is lexically possible, for the fourth amendment is written broadly. When interpreting the Constitution it is tempting to see how far old texts can be pressed—for any limitations, any at all, create at least some possibility of horrible deeds slipping into the cracks. A sophisticated lawyer worried about abuses starts with the text and identifies its purposes and consequences. The fourth amendment protects both privacy and property—and of course property comprises many rights, including possession. Next comes a generalization in which the Constitution deals with whatever may threaten these interests to any degree. That move eliminates loopholes, but at the expense of making the fourth amendment so universal that it occupies the field of governmental action. Privacy and property interests just about exhaust the entitlements our legal system recognizes. As the fourth amendment bars unreasonable action, a reading taking the covered interests to the limits transfers to the federal judiciary the power to decide whether every public action is reasonable. What is left for the rest of the Constitution—or for state law and democratic choice?

If the fourth amendment indeed covers all governmental action interfering with possessory interests, the implications are startling. Public employees repairing a street negligently rupture a gas main, requiring the evacuation of a city block. That action invades a possessory interest, for it deprives the householders of the practical ability to use their homes. Negligence is never reasonable, and the fourth amendment establishes objective standards, under which the public employees' states of mind do not matter. *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989); *Maryland v. Macon,* 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2782–83, 86 L.Ed.2d 370 (1985); *Scott v. United States,* 436 U.S. 128, 136–38, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978). Public utility companies will be surprised to learn that turning off the water or electricity poses not only a problem under the due process clause, which they may solve by offering their customers an opportunity to comment, *Memphis Light, Gas & Water Division v. Craft,* 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978), but also a problem under the fourth amendment, requiring *substantive* federal review of the "reasonableness" of the decision—for disconnecting utilities is the step said to prevent the Soldals from using their trailer and so violate the fourth amendment.

All the sheriffs' deputies did was stand by while the landlord's employees disconnected the trailer's utilities and removed it from their lot. If this is a "seizure" of any kind by the deputies, cf. *California v. Hodari D.,* —— U.S. ——, 111 S.Ct. 1547, 1550–51, 113 L.Ed.2d 690 (1991), it is problematic only because state law specifies that a court order precede eviction. Indeed, the only reason why the removal of the mobile home is said to be "unreasonable" is that it violated state law, and this whether or not the Soldals really were behind in their rent or disregarded some clause of the lease. Our case is another chapter in the saga of attempts to transmute state rules into constitutional ones. If the Soldals were right in thinking that there was a "seizure", the question would remain whether a federal norm, independent of state law, nonetheless deems their acts unreasonable. *Elkins v. United States,* 364 U.S. 206, 223–24, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960) ("In determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry.... The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed."). States could decide to allow landlords to engage in self-help and put the burden of initiating litigation on the tenant. If deputies may keep the peace during self-help in a state where tenants must start the legal proceedings, they may prevent violence during self-help in a state where landlords have (but disdain) the burden of initiation. Only state law distinguishes these cases, and the Constitution is unaffected by state law. It is hard to conceive

of the Soldals' invocation of the litigation-first rule established by Illinois law as a claim under the fourth amendment, so the suit was properly dismissed even if a seizure occurred. States may decide for themselves how extensive will be the remedies for gun-jumping.

FLAUM, Circuit Judge, with whom BAUER, Chief Judge, and HARLINGTON WOOD, Jr., RIPPLE and KANNE, Circuit Judges, join, dissenting.[1]

In its effort to develop a rationale for denying the Soldals' fourth amendment claim, the majority has produced a remarkable holding. The fourth amendment, it maintains, governs should police *intrude* upon your privacy by searching your home. Should they instead intentionally *eliminate* your privacy by participating in the carting away of your residence, the fourth amendment can have no bearing. With all due respect, I dissent.

The majority acknowledges that the police denied the Soldals the privacy of their home, but maintains that the fourth amendment is concerned only with intrusions of privacy as the right to secrecy rather than as the right to solitude. To be sure, there is a distinction between these aspects of privacy, but not one that should bar the applicability of the fourth amendment in the limited and unique circumstances of this case.[2] Along with the right to secret one's effects, or words, or actions, the right of privacy encompassed by the fourth amendment protects—in Justice Brandeis' words, dissenting in *Olmstead*—"the right to be let alone," giving the individual the right to isolate himself from unreasonable government intrusions. In my view, there are few infringements of privacy greater than denying the enjoyment of one's home. Arrests—in which police figuratively, and often literally, remove the individual from the home, in contrast to taking the home

from the individual—involve the most comparable deprivation of privacy. An arrest gives police the right to search the individual, but the applicability of the fourth amendment's protections to police conduct during arrests does not turn on whether or not they conduct a search incident to the arrest, so the invasion of privacy must be inherent in the arrest itself. The majority acknowledges the invasion of privacy inherent in arrests, *ante* at 1078, but does not address *how* an arrest invades privacy in any sense other than as an interference with the arrestee's right to solitude.

The analogy between an arrest and the police involvement in the seizure of the Soldals' trailer is easily seen when we consider what happened to Edward Soldal the next day. When Mr. Soldal returned to the trailer park to retrieve two of his children (whom he had left with a neighbor for the night after he was evicted from the trailer park), police arrested him for trespassing. That seizure gave Mr. Soldal a fourth amendment claim, even though it was merely a continuation of the previous day's attempts to evict the Soldals from the trailer park. We all agree that Mr. Soldal has a valid fourth amendment claim because the arrest was made without probable cause to believe that he was a trespasser; why, then, does he not raise a valid fourth amendment claim with regard to the seizure of his home when police had no more basis for assisting in the eviction? Suppose that the police had been requested to usher Mr. Soldal and his family from the trailer park *before* their trailer was towed away. In that case, the Soldals would have a fourth amendment claim stemming from the forcible removal from the premises; why should they lose the claim when police first help to remove their home, giving them no choice but to leave?

I am not, of course, suggesting that the seizure of *any* private property is an in-

---

**1.** My dissent is directed toward only the Soldal's fourth amendment claim regarding the seizure of their trailer. As I indicated in my dissent to the panel opinion, I concur in the remand of Mr. Soldal's fourth amendment claims arising from the subsequent unlawful arrests.

**2.** To the extent that the fourth amendment affords different degrees of protection to these aspects of privacy, a stronger argument can be made for extending greater protection to the right of privacy as solitude rather than as secrecy. *See* R. POSNER, ECONOMIC ANALYSIS OF LAW 639 (3d ed. 1986).

fringement of privacy, for most property affords little privacy to persons as opposed to their effects. Indeed, the home appears *sui generis* in this important but limited regard. Taking a pen does not compromise the privacy of its owner's person, nor does seizing a container in which personal effects are stored. An automobile might, at one time, have been thought to afford privacy to its occupants (as well as to their possessions), but that era is past. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1979). By contrast, the right to privacy a home affords its residents, whether by sheltering their possessions or their persons from government interference, has always been at the core of the fourth amendment's protections. "[T]he Court since the enactment of the Fourth Amendment has stressed 'the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic,'" for it is the home that, more than any other location, "provide[s] the setting for those intimate activities that the Amendment is intended to shelter from government *interference or surveillance.*" *Oliver v. United States*, 466 U.S. 170, 178–79, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214 (1984) (quoting *Payton v. New York*, 445 U.S. 573, 601, 100 S.Ct. 1371, 1387, 63 L.Ed.2d 639 (1980) (emphasis supplied)).

The majority's resort to *United States v. Lindsey*, 877 F.2d 777 (9th Cir.1989), puzzles me, as I conclude that the case clearly illustrates my point. The majority acknowledges that when, as in *Lindsey*, police secure a home without searching it, they violate the residents' fourth amendment rights. The Soldals allege that police violated their fourth amendment rights in almost exactly the fashion described in *Lindsey*—in both cases police action intruded upon the personal privacy of the occupants of the homes by eliminating their

ability to isolate themselves within their residences—except that in this case instead of physically occupying the house, it is as if the police surrounded the exterior of the home and denied the residents access to it.[3] It seems to me that such an intrusion is every bit as "palpable" as the intrusion described in *Lindsey*.

In my judgment, the analogy to arrest leads to a broader, though no less telling, indictment of the majority's position. I respectfully suggest that the fourth amendment is not concerned exclusively with privacy. Indeed, the Court expressly rejected that view in *Katz v. United States*, the case the majority heralds as the confirmation that privacy alone is the fourth amendment's province. *See* 389 U.S. at 350, 88 S.Ct. at 510 ("[the Fourth Amendment] protects individual privacy against certain kinds of governmental intrusion, but its protections go further, and often have nothing to do with privacy at all."). The analogy I draw between arrests and the seizure at issue in this case underscores the point. In the face of case law that states the proposition explicitly, the majority opinion recognizes that arrests implicate the fourth amendment not only because they invade privacy but also because they restrict liberty. *Ante* at 1080. Indeed, the opinion further observes that property seizures that infringe the property owner's liberty to go about his business implicate the fourth amendment as well. *Id.* *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), makes that point, and it is an instructive case for this and other reasons.

In *Place*, police detained the luggage of a suspected narcotics trafficker for three days before they obtained a search warrant. The police took custody of the bags initially while they made arrangements to have a narcotics dog sniff them; after the

---

**3.** In my view the distinction is largely irrelevant to fourth amendment analysis. Securing a home is a seizure that intrudes upon the solitude of the residents whether accomplished by an entry into the home or by surrounding its perimeter. Similarly, both methods "interfere to the same extent with the possessory interests of the owners." *Segura v. United States*, 468

U.S. 796, 811, 104 S.Ct. 3380, 3389, 82 L.Ed.2d 599 (1984) (Burger, C.J., joined by O'Connor, J.). More on this in a moment. In any event, whether it constitutes an invasion of privacy as solitude, an interference with possession, or both, securing a home is actionable under the fourth amendment, and that is the point recognized by the court in *Lindsey*.

dog arrived and alerted to one of the bags some 90 minutes later, police retained the bags over the weekend until they could obtain a warrant from a magistrate on the following Monday morning. The Supreme Court held that although no search of the bags had occurred because the invasion of privacy entailed by the dog sniff was virtually nonexistent, 462 U.S. at 707, 103 S.Ct. at 2644, the bags had been unlawfully seized because the police had intruded "on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary." *Id.* at 708, 103 S.Ct. at 2645.

I find the majority's nod to *Place, ante* at 1079, to be misplaced in light of the reasoning employed and the result reached by the Court in that case. If the detention of luggage for even 90 minutes was an unreasonable deprivation of liberty in *Place, see* 462 U.S. at 709–10, 103 S.Ct. at 2645–46, I cannot concur with the majority's view that there was *no* deprivation of the Soldals' liberty interests, reasonable or otherwise, when their home was illegally towed away. Place, whom the police had some reason to suspect of criminal activity, was inconvenienced by the loss of the clothing, personal effects, and, of course, the cocaine, his bags contained. The Soldals, whom police had no reason to suspect of any wrongdoing whatsoever, were deprived of the occupancy of their home. The members of the majority apparently believe that Place suffered a greater loss. I do not.

Perhaps even more distressing than the majority's conclusion that the police *did not* restrict the Soldals' liberty is its acknowledgement that the police *did* disrupt their possessory rights. The concession is disturbing, because the majority goes on to hold that the disruption is not actionable under the fourth amendment because it was not attended by any invasion of privacy. That position strikes me to be at odds with the myriad cases in which the Supreme Court has affirmed that the fourth amendment's proscription against unreasonable seizures shields the individual's *possessory* interest in the property seized— an interest altogether different than the individual's *privacy* interest in the property. The majority does not address the Court's statement in *Place* that the seizure violated the fourth amendment because it unreasonably infringed "the suspect's possessory interest in his luggage." 462 U.S. at 708, 103 S.Ct. at 2645. Nor does it heed cases like *Rakas v. Illinois,* in which the Court explicitly recognized that although a search of a home (and by extension, a car) does not violate any legitimate expectations of privacy of visitors in the home, those visitors could nonetheless "contest the lawfulness of the seizure of evidence ... if their own property were seized during the search." 439 U.S. 128, 142 n. 11, 99 S.Ct. 421, 430 n. 11, 58 L.Ed.2d 387 (1978). *See also United States v. Salvucci,* 448 U.S. 83, 91 n. 6, 100 S.Ct. 2547, 2552 n. 6, 65 L.Ed.2d 619 (1980) ("Legal possession of the seized good may be sufficient in some circumstances to entitle a defendant to seek the return of the seized property if the seizure, as opposed to the search, was illegal."); *United States v. Jackson,* 585 F.2d 653, 657 (4th Cir.1978) (defendant's ownership of a bag containing gambling receipts found in car belonging to another gave him standing to contest seizure of the bomb though not the search of the car) (citing *United States v. Lisk,* 522 F.2d 228, 230–31 (7th Cir.1975) (Stevens, J.), *cert. denied,* 423 U.S. 1078, 96 S.Ct. 865, 47 L.Ed.2d 89 (1976)). It devotes little attention to cases like *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), in which the Court held that by asserting control over a package that had already been opened and searched by private parties, federal agents "seized" the package for purposes of the fourth amendment even though the agents did not invade the privacy of the package's owner when they seized it. *Id.* at 120–21, 104 S.Ct. at 1660. *See also Autoworld Specialty Cars v. United States,* 815 F.2d 385, 389 (6th Cir.1987) (seizure by customs agents of automobiles displayed in public showroom subject to fourth amendment despite lack of invasion of privacy); *United States v. Bagley,* 772 F.2d 482, 490 (9th Cir.1985) (towing of lawfully parked car belonging to suspect who had not been

apprehended "constituted a seizure within the meaning of the fourth amendment"); *United States v. Roberts*, 644 F.2d 683, 688 (8th Cir.1980) (en banc) (seizure by police of marijuana discovered by private party in rental storage unit actionable under fourth amendment). The majority does suggest that *Cardwell v. Lewis*, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974), supports its view, but does not explain that although no search or seizure took place when police obtained paint scrapings from the car, a seizure did occur when the police towed the car away. *Id.* at 593, 94 S.Ct. at 2470. Another seizure occurred when police assisted in towing the Soldals' home away.

The Court's most recent affirmation, in 1990, of the fourth amendment's applicability when government officials interfere with possessory interests is, I submit, also its most plain. Consider the language of *Horton v. California*, — U.S. —, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990):

> The right to security in person and property protected by the Fourth Amendment may be invaded in quite different ways by searches and seizures. A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property. The "plain view" doctrine is often considered an exception to the general rule that warrantless searches are unreasonable, but this characterization overlooks the important difference between searches and seizures. If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy. *A seizure of the article, however, would obviously invade the owner's possessory interest.*

110 S.Ct. at 2306 (footnotes and citations omitted; emphasis added). For that reason, the seizure at issue in *Horton* was subject to fourth amendment analysis. I see no way to square the Supreme Court's view that seizures, even in the absence of an invasion of privacy, implicate the fourth amendment, with the majority's view that they do not.

Unlike the majority, I do not read *Hudson v. Palmer* to have fundamentally altered this longstanding tenet of the Supreme Court's fourth amendment jurisprudence. In that case, prison authorities seized a ripped pillow case found in an inmate's cell during a "shakedown" search; the Court held that the prisoner did not have a cause of action under the fourth amendment. The majority says that *Palmer* shows the fourth amendment does not protect property interests because if it did the prisoner would have been able to invoke the fourth amendment to challenge the seizure of the pillowcase even if he were unable to challenge the search itself. *Palmer*'s result, however, was premised on the Court's conclusion that prison inmates have neither privacy *nor possessory* rights in property maintained in their jail cells. 468 U.S. at 527–28 & n. 8, 104 S.Ct. at 3200–01 & n. 8 (rejecting seizure claim "for the same reasons"); *id.* at 538, 104 S.Ct. at 3206 (O'Connor, J., concurring) ("The fact of arrest and incarceration abates all legitimate Fourth Amendment privacy and possessory interests in personal effects...."); *id.* at 542, 544–45, 104 S.Ct. at 3208, 3209–10 (Stevens, J., dissenting) (rejecting majority's position that prisoner's have no privacy or possessory interests in their property); *see also* W. LaFave, Search and Seizure §§ 2.4(d), 10.9(a) (2d ed. 1987). The Court's holding, then, was limited to the prison environment, making the case particularly unsuited to carry the burden heaped upon it by the majority.

Troubled as I am by the majority's interpretation of binding precedent, consider why, under the majority's approach, *any* seizure, whether made in the course of a law enforcement investigation or a civil property dispute, should be subject to the strictures of the fourth amendment. When police seize a suspect's personal effects after a search, the seizure does not implicate the suspect's right to privacy. As *Horton* and *Place* explain, and the majority apparently agrees, the invasion of privacy attends the search rather than the seizure. Why, then, does the majority treat a search as a prerequisite to a seizure under the fourth amendment? If the fourth amendment protects only privacy interests, it should not be employed to bar even those

seizures that have been preceded by a search since the seizure itself does not infringe privacy. The majority ties these two distinct concepts together because it assumes that a seizure is the object of the invasion of privacy—"police search in order to seize." *Ante* at 1079. That assumption, I believe, misconceives the investigatory process. Police search to uncover information (therein lies the invasion of privacy); they seize for other reasons, usually to gather evidence to present at trial (therein lies the disruption of possession). This case illustrates another, albeit objectionable, reason police might seize private property. In neither case are seizures a necessary incident of a successful search—police can present evidence of the results of a search or investigation by means of their own testimony. *Cf. United States v. Jacobsen*, 466 U.S. 109, 119, 104 S.Ct. 1652, 1659, 80 L.Ed.2d 85 (1984). The fourth amendment governs seizures, but not, as the majority asserts, because they are inextricably bound up with searches.[4] The reason is simply that the plain language of the fourth amendment guarantees the right to be secure against both "unreasonable searches *and* seizures."

The fourth amendment guarantees that right to the average citizen as well as to the average criminal. The outcome of this case highlights the anomaly, to which I adverted in my original dissent to the panel opinion, created by the majority's desire to restrict the scope of fourth amendment protections to cases in which the police, or other state actors, are engaged in investigative activity. That approach would extend greater fourth amendment protection to those suspected of crimes than to those against whom the police harbor no suspicions at all. *See* 923 F.2d at 1253. Unlike the majority, I do not find this to be a "superficial" concern. Neither, apparently,

has the Supreme Court, which has found it necessary on repeated occasions to reiterate that the applicability of the fourth amendment does not turn on whether the victim of a search or seizure was the object of police suspicion. *See, e.g., O'Connor v. Ortega*, 480 U.S. 709, 714–15, 107 S.Ct. 1492, 1496, 94 L.Ed.2d 714 (1987) (searches and seizures by government employers of the private property of employees subject to fourth amendment) (plurality opinion); *Wyman v. Jones*, 400 U.S. 309, 317, 91 S.Ct. 381, 385–86, 27 L.Ed.2d 408 (1971) ("one's Fourth Amendment protection subsists apart from his being suspected of criminal behavior"); *Camara v. Municipal Court*, 387 U.S. 523, 530–31, 87 S.Ct. 1727, 1732, 18 L.Ed.2d 930 (1967) ("even the most law-abiding citizen has a very tangible interest in limiting the circumstances under which the sanctity of his home may be broken by official authority"); *Go–Bart Co. v. United States*, 282 U.S. 344, 357, 51 S.Ct. 153, 158, 75 L.Ed. 374 (1931) ("[the fourth amendment] protects all, those suspected or known to be offenders as well as the innocent"); *Weeks v. United States*, 232 U.S. 383, 392, 34 S.Ct. 341, 344, 58 L.Ed. 652 (1914) ("This protection reaches all alike, whether accused of crime or not. . . .").

To fully appreciate the incongruous nature of the majority's position, one must also consider how this case might have played out had the police acted more reasonably. Imagine that the sheriffs had been less willing to accommodate the Soldals' landlord when she told them that she wanted the Soldals out because they were behind in their rent. Suppose that instead of immediately assisting the landlord's employees, the police had forced Mr. Soldal to show them his lease, threatening to have his trailer towed away if he did not comply with their demand. Had the police done nothing further, they would certainly have

---

**4.** To be sure, that a seizure has been preceded by a lawful invasion of privacy can be *relevant* to whether the seizure itself is reasonable. *See Jacobsen*, 466 U.S. at 120–22, 104 S.Ct. at 1660–61. But that is not to say that the applicability of the fourth amendment turns on an invasion of privacy but only that whether there has been a lawful invasion of privacy bears upon whether

a subsequent seizure comports with the amendment's requirement of reasonableness. In the same way, the length of the deprivations suffered may be relevant to the reasonableness of the police actions, but not to the question of whether the fourth amendment applies at all. *Place,* 462 U.S. at 708–09, 103 S.Ct. at 2645.

disrupted the lives of the Soldals far less than they did when they helped to seize the trailer. And yet, under the majority's view, the Soldals might nevertheless have a fourth amendment cause of action—relating to the coerced "search" for the lease—when they would have no fourth amendment action if the police had dispensed with any investigation and had simply taken their cue from the landlord. Such a result, I suggest, has little to recommend it.

The majority nevertheless endorses this outcome. My colleagues apparently fear that recognizing the Soldals' fourth amendment claim will unleash in the federal courts a torrent of litigation stemming from private repossessions.[5] As I do not believe that government officials routinely ignore the law and evict people from their homes solely at the whim of private creditors, I do not share that concern. Even assuming for a moment that the incidence of such conduct is significant, it would not justify denying access to the federal courts to redress a meaningful constitutional injury. The majority's concern stems from its insistence on characterizing this case as a "garden variety" property dispute, but when police embroil themselves in such disputes, I submit that they lose their generic quality. This is not, as the majority alleges, an ordinary dispute between landlord and tenant, nor is it a case in which the police merely tried to "keep the peace." This is a troubling case in which the claim is that a landlord and the local police illegally teamed up to dislodge a man's home from its moorings and towed it away simply because they both found him disagreeable. I see *nothing* ordinary about this course of events, nor can I view it as a

simple case of jumping the gun on otherwise constitutional state procedures.

The majority claims that the Soldals had other constitutional remedies available to them; their claim, says the court, is really a procedural due process claim that must be brought in state court if adequate remedies are available there. The Soldals' claim is no more a procedural due process claim, however, than is *any* fourth amendment claim; indeed, it is less so. A warrantless search may be "reasonable," in the sense that it is based on probable cause, and nevertheless violate the fourth amendment simply because those conducting the search failed to comply with the warrant procedures prescribed by law. *Katz*, 389 U.S. at 356–57, 88 S.Ct. at 514. Here, the police neither complied with the eviction procedures required by law nor (so far as we know) had any basis for believing that the eviction was warranted substantively.

As I pointed out in my original panel dissent, the Court in *Zinermon v. Burch* used a fourth amendment violation as the paradigmatic example of a case in which a plaintiff "may bring a § 1983 action for an unlawful search and seizure despite the fact that the search and seizure violated the State's Constitution or statutes, and despite the fact that there are common-law remedies...." 494 U.S. 113, 110 S.Ct. 975, 982–83, 108 L.Ed.2d 100 (1990). The Court explained that procedural due process claims are those in which "the deprivation by state action ... is not in itself unconstitutional." *Id.* As we have seen, unreasonable seizures are unconstitutional in and of themselves, and *Zinermon* should therefore set to rest any attempt to invoke the availability of state remedies as a ground for denying fourth amendment claims.[6]

---

**5.** Judge Easterbrook goes the majority one better, raising the specter that recognizing the Soldals' fourth amendment claim would open the flood gates to negligence claims clothed in the fourth amendment. Specter it is, though, because a seizure is the product of an intentional application of force, a point *California v. Hodari D.*, ⸺ U.S. ⸺, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), underscores.

**6.** Respectfully, Judge Easterbrook's reference to *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), puts the cart before

the horse. The issue here is whether there has been a seizure within the meaning of the fourth amendment, not whether the seizure was reasonable. *Elkins* states that compliance with state procedures is not the benchmark of fourth amendment reasonableness. It, like *Zinermon*, rejects the view that the fourth amendment's scope depends on either the availability or adequacy of state procedures. As for the "reasonableness" of the seizure, I note only that the majority opinion acknowledges that the deputies did more than "keep the peace" and that we have held that in damages suits for alleged civil

This point was apparently not lost on the Soldals, who never attempted to characterize their claim as one for procedural due process, a fact acknowledged in the original panel opinion. *See* 923 F.2d at 1248.

*Zinermon* notwithstanding, the majority claims that *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), supports its approach. Once again, however, the majority and I part company over precedent. I would argue that *Graham* does not, as the majority claims, stand for the principle that the dominant *character* of the conduct challenged in a section 1983 case determines the only constitutional standard under which the case may be evaluated; that would mean that civil rights plaintiffs would be obliged to choose a single constitutional provision in which to ground their suits, even when the alleged infringement encompasses more than one constitutional provision (say, for example, the first and fourth amendments, as in cases where the authorities seize allegedly obscene materials not for evidentiary purposes but simply to destroy them; these seizures must be reviewed under both the first *and* the fourth amendments—*see Heller v. New York*, 413 U.S. 483, 491, 93 S.Ct. 2789, 2794, 37 L.Ed.2d 745 (1973)). *Graham* is more accurately described, as it was in *Schroeder v. City of Chicago*, 927 F.2d 957, 961 (7th Cir.1991) (Posner, J.), as establishing a preference for grounding section 1983 actions in specific provisions of the bill of rights where possible rather than relying on the more inchoate protections afforded by the doctrine of substantive due process. *See* 490 U.S. at 395, 109 S.Ct. at 1871 ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."). In this light, the majority's view that *Graham* requires the Soldals to rely on the due process clause in any fashion

when they have a cause of action under the fourth amendment seems untenable.[7]

In an era in which "reasonable expectations of privacy" seem to be diminishing, preserving the sanctity of the home becomes all the more critical. We take too lightly "the right to be let alone" when we conclude that the fourth amendment has no possible relevance to a claim that deputy sheriffs, in contravention of the laws they are charged to know and uphold, helped roust a family from their home and cart it away at the behest of a trailer park manager. That is exactly the type of governmental intrusion that the fourth amendment regulates, whether we label the intrusion one of privacy, property, or liberty. The majority believes that we should recognize one more "fine distinction" in fourth amendment law—one that I find nowhere evident in the language of the amendment itself or the opinions of the Supreme Court—to stem an anticipated onslaught of fourth amendment *poseurs*. That belief provides little justification for hastening the demise of the most significant citadel of solitude available to Americans. The majority opinion does not merely nibble at the margins of the fourth amendment's protections; it gnaws at their very core. Some thirty years ago, dissenting from the Supreme Court's refusal to address the merits of a challenge to a Connecticut law prohibiting the use of contraceptives by married couples in *Poe v. Ullman*, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), Justice Harlan anticipated and addressed precisely the argument the majority surfaces today, and I cannot improve upon his analysis:

> [I]t must be acknowledged that there is another sense in which it could be argued that this intrusion on privacy differs from what the Fourth Amendment ... [was] intended to protect: here we have not an intrusion into the home so much as on the life which characteristically has its place in the home. But to my mind

rights violations involving the fourth amendment, the reasonableness of police action is a question of fact for the jury. *Llaguno v. Mingey*, 763 F.2d 1560, 1565 (7th Cir.1985) (*en banc*).

7. This is particularly true in light of the fact that the Soldals raised a *substantive* due process claim, but the original panel majority chose not to address it. *See* 923 F.2d at 1251.

such a distinction is so insubstantial as to be captious: if the physical curtilage of the home is protected, it is surely as a result of solicitude to protect the privacies of the life within. Certainly the safeguarding of the home does not follow merely from the sanctity of property rights. The home derives its preeminence as the seat of family life.

*Id.* at 551, 81 S.Ct. at 1781. The majority's opinion compromises that preeminence, and I am therefore obliged to dissent.