**OPEN INNS, LTD., et al.**

v.

**CHESTER COUNTY SHERIFF'S DEPARTMENT, et al.**

**No. CIV. A. 97–4822.**

United States District Court, E.D. Pennsylvania.

Oct. 20, 1998.

Anthony Valenti, Cureton, Caplan & Clark, P.C., Mt. Laurel, NJ, for Plaintiff.

Robert C. Houpt, Houpt, Wolffe & Huganir, Paoli, PA, for Defendant.

## MEMORANDUM

DALZELL, District Judge.

Plaintiffs, Open Inns, Ltd. and Associated Motor Inns Co., have sued the Chester County Sheriff's Department, its sheriff, and several of its officers to challenge the constitutionality of an admitted Sheriff's Department custom or practice. This practice authorizes Department officers, at any hour of the day or night, to be hired by private parties to accompany and assist them in serving process in civil actions and then to remain on the premises at the behest (and expense) of those parties while their agents seize property, all without any inquiry into the legality of such actions, such as whether the seizures are taken pursuant to an antecedent court order or writ. This custom may fairly be summarized as the "don't ask, don't think policy", and we shall throughout this Memorandum use that shorthand for it.

In particular, plaintiffs contend that defendants' pre-arranged participation in the unlawful repossession of the Lionville Holiday Inn in Exton, Pennsylvania from 3:20 a.m. to 5:30 a.m. on August 26, 1995 gave the unlawful repossession a cachet of legality and converted it into state action in violation of 42 U.S.C. § 1983. As the material facts of this case are not in dispute, we will deny defendants' motion for summary judgment and grant plaintiffs' motion for summary judgment as to liability.

*Facts* [1]

Plaintiff Open Inns, Ltd. ("Open Inns") is a limited partnership that was formed and organized to operate the Lionville Holiday Inn. At all relevant times, Open Inns was the tenant of the Lionville Holiday Inn and occupied the hotel pursuant to a written lease with the owner of the property, Cignature Hospitality, Inc. ("Cignature"). Raymond Carr ("Carr") was the sole or primary share-

---

1. As noted, the material facts are not disputed in this case. Where there are arguable factual discrepancies, we have taken the defendants' version of events as true.

holder of Cignature.[2] The initial term under the lease was to continue through June 1, 1988, with Open Inns having an option to extend the term of the lease for four extension periods of five years each, or, in other words, until June 1, 2008. Accordingly, as of August 26, 1995, there were as many as thirteen years left on the lease.

Plaintiff Associated Motor Inns Co. ("AMI") is a closely-held Ohio corporation that occupied and managed the Lionville Holiday Inn pursuant to a written management agreement entered into between Open Inns and AMI. The terms of the management agreement ran concurrently with the term of the lease between Open Inns and Cignature, and provided that AMI would receive three percent of all room revenues and five percent of all restaurant and lounge receipts.

In the summer of 1995, Open Inns fell behind in its lease payments to Cignature. On August 24, 1995, Cignature filed a civil complaint in the Chester County Court of Common Pleas against Open Inns. *See Cignature Hospitality Ltd. v. Open Inns, Ltd.*, Civ. No. 95–7865 (C.P. Chester County). The complaint Cignature filed sought only money damages for back rent and no other form of relief.

On the same day, Cignature's attorney, Anthony Morris, filed a request with the Chester County Sheriff's Department to serve the complaint. In making the request, Morris spoke with defendant Lieutenant Malcolm D. LaRose, the supervisor of the Civil Unit in the Chester County Sheriff's Department.[3] In that conversation, Morris requested that the complaint be served on Open Inns "late at night" and that the Sheriff's officers be authorized for up to twelve hours of overtime (six hours each) so that they could accompany Carr and his attorneys. LaRose authorized the service of the complaint at the time Cignature's counsel requested (LaRose testified that he so authorized "with the approval of higher-up") and authorized overtime for two sheriff's officers. LaRose Dep. at 27. LaRose did not question why counsel wanted the complaint served late at night, or why the officers were needed for up to six hours each.[4]

LaRose assigned defendants Sergeant Edward R. Clemens and Deputy Sheriff John R. Freas to effectuate service of process. LaRose sent Clemens as the senior person, who in turn was responsible for the supervision of Freas.[5] LaRose did not give either Clemens or Freas any special instructions or explanation other than that they may be required to remain on the premises after serving process. *See* Clemens Dep. at 24. Instead, LaRose instructed Freas and Clemens to meet Carr and his attorneys at Carr's office

---

2. The lease originally was entered into with Pickering Creek Industrial Park, Inc., which ultimately changed its name to Cignature.

3. LaRose has been employed by the Chester County Sheriff's Department for approximately nineteen years and has been the supervisor of the civil unit for at least the past ten years. As supervisor of the civil unit, LaRose is responsible for the supervision of all of the sheriff's deputies within the civil unit.

4. In his deposition, LaRose testified that he "probably" was told that a repossession of the hotel was going to take place after the service of process was completed, but he could not specifically recall. *See* LaRose Dep. at 42–44. As we will discuss further below, *see infra* at 31–52 (discussing the liability of the defendants in their official capacity), the reason why LaRose did not question Morris about the need for overtime is because he simply was following the don't ask, don't think policy. *See, e.g.*, LaRose Deposition:
Q. ... It's a regular practice, then, to permit service at the time requested by the attorneys?
A. Yes.

Q. And it is a regular practice for attorneys to request that the deputies remain with them while they take possession of something?
A. Mm-hmm.

Q. Okay. And they pay for that time?
A. Yes.

Q. So, is it accurate to say, basically, that the Chester County Sheriff's Department—you can disagree with this characterization, but I'm almost understanding this to be a situation where you will actually rent your officers to private attorneys.
A. Sure. LaRose Dep. at 70–71.

5. Clemens has been employed in the civil unit of the Chester County Sheriff's Department for about ten years. *See* Clemens Dep. at 8. Freas has been employed by the Chester County Sheriff's Department for some twelve years and has spent the past nine years in the civil unit. *See* Freas Dep. at 8–9.

at 1:00 a.m. on August 26th. LaRose advised the officers that they would receive their instructions from Carr's counsel. *See* Freas Dep. at 19; LaRose Dep. at 65.

As instructed, Clemens and Freas met Carr and his counsel at Carr's office at the arranged hour. After their arrival, Carr's counsel told Freas and Clemens that Carr intended to take possession of the Lionville Holiday Inn and wanted the officers to remain on the premises after serving the civil complaint. Both officers agreed to remain on the premises until Carr's counsel relieved them. *See* Clemens Dep. at 35–36, 41–42; Clemens Dep. of 9/12/96 at 26; Freas Dep. at 26–27.

In his deposition, Freas admitted that before going to Carr's office, he had read the papers that were being served on Open Inns and was aware that what they were serving was a civil complaint for money damages only. *See* Freas Dep. at 21, 25. Freas also testified that he was aware that there was no writ of possession or court order requiring Open Inns to turn over the hotel. *See id.* at 46. Before serving process, and upon learning that Carr and his lawyers were going to take possession of the hotel, Freas stated to Carr that his role was to serve the complaint and then to remain while the repossession took place in order to "keep the peace" until he was told that Carr's counsel relieved him. *See* Freas Dep. at 26–29.[6]

In his deposition, Clemens stated that he did not read the complaint before serving it, but he knew that it was some type of a civil action involving breach of contract. *See* Clemens Dep. at 27, 63. Clemens further testified that prior to serving process he knew there was no writ of possession, *see id.* at 61, but that he believed that Carr had legal

authority to take possession of the hotel under a clause in a contract and by virtue of the fact that Carr had legal counsel with him.[7] *See* Clemens Dep. at 63, 69. Neither Clemens nor Freas apparently asked Carr whether he had any legal authority to repossess the hotel, nor did Carr's counsel tell them so.

After remaining at Carr's office for about two hours, Clemens and Freas departed for the Lionville Holiday Inn in a marked police car shortly after 3:00 a.m.[8] En route to the hotel, Clemens contacted county radio and requested that they have an Uwchlan Township police officer meet them so they could advise the officer of what was taking place. Sergeant Laurence W. Lester of the Uwchlan Township Police Department met Clemens and Freas at a Gulf Station down the street from the Lionville Holiday Inn. At that time, Clemens advised Lester as a "professional courtesy" that "they would be executing a civil proceeding" at the Holiday Inn. *See* Lester Dep. at 21–22.

Thereafter, at about 3:20 a.m., Clemens and Freas, along with Carr, his two attorneys, and perhaps five or six others entered the Lionville Holiday Inn and approached the front desk. Freas and Clemens were fully armed and in full police uniform. As Freas and Clemens approached the front desk, Carr and his team were behind them. According to Freas, he served the night manager, Clifford Hoffman, and read the Notice to Defend. Freas then claims that Hoffman asked him if there was anything to sign. Freas said there was nothing to sign. Freas then informed Hoffman that "I believe these gentlemen [Carr and his colleagues] would like to talk to you." Freas Dep. at 32. Freas and Clemens then stepped away from

---

**6.** When asked in his deposition whether he knew if Carr had legal authority to take possession of the hotel, Freas stated: "I couldn't say one way or the other whether he had legal authority because I couldn't make that judgment. The only way to make that judgment would be attorneys arguing out in a court of law." *Freas Dep.* at 37. "As far as I know, I had no writ of possession to take possession and turn it over to [Carr]. What [Carr] was doing basically was of a self-help nature, and I am not too familiar with that. He was pulling his right." Freas Dep. at 38–39.

**7.** In his September 12, 1996 deposition, Clemens testified, when asked whether he knew if the paper he was serving referred to the takeover of the hotel by Carr: "All I knew was something to do with breach of contract and some type of clause that he [ (Carr) ] could do that. That was between their attorney and him." Clemens Dep., 9/12/96 at 24.

**8.** Carr, his lawyers, and several of Carr's other representatives apparently followed the officers or were close behind them in other vehicles.

the counter, while Carr proceeded to tell the night manager that he was taking possession of the hotel.

At that moment, Hoffman, with the civil complaint in his hand, turned to Deputy Sheriff Freas and stated, "How the fuck can they be doing this?" *Id.* at 33. Freas alleges that he responded, "My job was to serve the complaint upon you. I cannot give you any legal information about what is going on. I would suggest that you call someone, an attorney. If you can't get a hold of someone, I would suggest that you talk to these people here." *Id.* at 33–34.[9] In his deposition, Hoffman stated that because of the presence of Carr and the "uniforms" (referring to the presence of two uniformed officers), he felt he "had no choice but to do what was requested to do or told to do." Hoffman Dep. at 18.

Service of the civil complaint was accomplished within five to ten minutes after Freas and Clemens arrived at the Holiday Inn. After this service, Hoffman turned over the keys to the hotel, and Carr and his team went around the hotel securing offices and maintenance areas, taking inventories of supplies, and taking possession of plaintiffs' assets. While all of this was happening, additional representatives of Carr and his new management team, Mardeck, Inc., emerged from the elevators.[10]

During the two hours after the complaint was served, between 3:30 a.m. and 5:30 a.m., Freas claims to have remained in the lobby near the front of the hotel watching what was happening. *See* Freas Dep. at 43–44. Clemens admits that during that two-hour period he searched for and found the hotel bartender to tell him what was happening "so that he would not be alarmed," Clemens Dep. at 45–46, walked "from time to time" between the lobby, the bar, and the kitchen "[j]ust to make sure that everything was all right," *id.* at 49, and at one point helped one of Carr's employees take an inventory of the contents of a freezer. *Id.* at 50–51. Freas and Clemens ultimately left the hotel at about 5:30 a.m., when Carr's counsel relieved them. *See* Clemens Dep. at 57.[11]

*Procedure and Claims*

Before plaintiffs filed this action on July 25, 1997, they had begun other civil actions in both the Court of Common Pleas of Chester County and here regarding the payment of back rent and the self-help repossession of the Lionville Holiday Inn. *See, e.g., Open Inns Ltd. v. Raymond H. Carr,* Civ. No. 95–08121 (C.P. Chester County); *Cignature Hospitality Ltd. v. Associated Motor Inns,* Civ. No. 96–7413 (E.D.Pa.). All of those civil actions ultimately settled.[12]

Having twice amended the complaint, plaintiffs now sue the Chester County Sheriff's Department,[13] Sheriff Robert A. Erling

---

9. In his deposition, the night manager, Hoffman, claims that Deputy Sheriff Freas specifically told him that he would have to turn over control of the property. *See* Hoffman Dep. at 5. While Freas disputes this statement, we find that it is not material, and we will, for purposes of analyzing plaintiffs' motion for summary judgment and viewing the record in the light most favorable to the defendants, assume that Freas never made the statement.

10. With the repossession, Carr apparently fired all of plaintiffs' staff. Carr's new management team from Mardeck, Inc. apparently stayed in rooms in the hotel in anticipation of the takeover, and came out of the elevator once the takeover began.

11. As we will explore more fully below, defendants LaRose, Clemens, and Freas testified in their depositions that the actions they took on August 25–26, 1995 were not in reliance upon any state statute, regulation, or any specific rule of court of which they were aware. Instead,

each defendant testified that the actions they took were in accordance with the don't ask, don't think policy. *See infra* at 41–50 (discussing the liability of defendants in their official capacity).

12. We presided over a settlement between Cignature Hospitality and Associated Motor Inns on February 21, 1997. *See Cignature Hospitality v. Associated Motor Inns,* Civ. No. 96–7413 (E.D.Pa. Feb. 21, 1997).

13. While *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) holds that local governments may be sued for their own § 1983 violations if their policies violate a plaintiff's constitutional or federal rights, the Chester County Sheriff's Department is a sub-unit of Chester County which cannot be sued because it is merely an arm of the local municipality, and thus is not a separate judicial entity. *See, e.g., Irvin v. Borough of Darby,* 937 F.Supp. 446, 450 (E.D.Pa.1996) (dismissing claim against the Darby Police Department since

(in his individual and official capacities),[14] Lieutenant Malcolm D. LaRose (in his individual and official capacities), Sergeant Edward R. Clemens (in his individual and official capacities), and Deputy Sheriff John R. Freas (in his individual and official capacities), alleging violations of their Fourth and Fourteenth Amendment rights pursuant to 42 U.S.C. §§ 1983 and 1988.[15]

In their summary judgment motion, defendants argue that, first, the individual defendants are entitled to qualified immunity and, second, the Sheriff is entitled to summary judgment because he is a state policymaker under the logic of *McMillian v. Monroe County*, 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997).[16] For the reasons set forth below, we will deny defendants' motion for summary judgment and we will grant plain-

---

the Borough of Darby is the proper defendant); *Curry v. Huyett*, Civ. No. 93–6649, 1994 WL 111357 at *2 (E.D.Pa.1994) ("The police department is merely an arm of the City ... and therefore, the City ... is the only proper defendant."); *Johnson v. City of Erie*, 834 F.Supp. 873, 878–79 (W.D.Pa.1993)(dismissing claims against the City of Erie Police Department as the proper defendant is the City of Erie). Accordingly, we will dismiss plaintiffs' claims against the Chester County Sheriff's Department.

As plaintiffs have sued all of the remaining defendants in their official capacities, however, plaintiffs have essentially sued Chester County. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (holding that a suit against a "state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."); *Monell*, 436 U.S. at 690 n. 55, 98 S.Ct. 2018 (holding that official capacity claims "generally represent only another way of pleading an action against an entity of which an officer is an agent.") Accordingly, as we below find defendants liable in their official capacities, we will grant plaintiffs leave to amend their complaint to add Chester County as a defendant prior to the trial on damages. *See* Fed.R.Civ.P. 15.

**14.** In their motion papers, plaintiffs do not claim to be suing Sheriff Erling in his individual capacity. Accordingly, to the extent that plaintiffs' second amended complaint mentions Sheriff Erling in his individual capacity, it is dismissed.

**15.** In their motion for summary judgment, plaintiffs claim violations of their Fourth Amendment rights, as well as violations of their Fourteenth Amendment procedural and substantive due process rights. In *Soldal v. Cook County*, 506 U.S. 56, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992), the Supreme Court made clear that certain wrongs can affect more than a single right and, accordingly, can implicate more than one Constitutional right. *See id.* at 548. As we below find defendants liable for violations of plaintiffs' Fourth Amendment rights, we do not reach plaintiffs' claims of violations of their Fourteenth Amendment substantive and procedural due process rights. We note, however, that as to plaintiffs' substantive due process claims, we cannot

ignore the Supreme Court's repeated warnings against an excessively elastic interpretation of the substantive component of the Due Process Clause. *See Collins v. Harker Heights*, 503 U.S. 115, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992)("As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."); *see also Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion) (quoting *Collins* with approval). Furthermore, as to plaintiffs' procedural due process claims, while some courts will combine a Fourth Amendment reasonableness analysis with a Fourteenth Amendment procedural due process analysis, *see, e.g., Flatford v. City of Monroe*, 17 F.3d 162, 170 (6th Cir.1994), we believe the proper approach is to conduct an independent review of both claims. *See Samuels v. Meriwether*, 94 F.3d 1163, 1167–68 (8th Cir.1996)(criticizing *Flatford* and holding that when a Fourth Amendment claim is brought, courts should conduct an independent review of the seizure for reasonableness in addition to any analysis regarding procedural due process). In this case, however, even though we find a lack of any pre- or post-deprivation notice or hearing, we do not address plaintiffs' procedural due process claims, as we do not need to find violations of *both* plaintiffs' Fourth Amendment rights and Fourteenth Amendment procedural due process rights to find liability here.

**16.** In their motion for summary judgment, defendants also argue that they are protected by state sovereign immunity and that the case should be dismissed for failure to join Cignature Hospitality, Ltd. as an indispensable party. These arguments are frivolous. First, as we will explain below, the Sheriff and his officers in this case are local officials, not state officers. Accordingly, state sovereign immunity does not apply here. Such an application of state sovereign immunity would in any event eviscerate § 1983 as it applies to municipal and county officers. Second, the fact that plaintiffs did not join Cignature Hospitality as a defendant in this suit is irrelevant. Plaintiffs already engaged in several other lawsuits which, as noted above, already have settled. Cignature is not an indispensable party to this action.

tiffs' motion for summary judgment as to liability only.[17]

### Standard for Summary Judgment

A summary judgment motion should only be granted if we conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). With a motion for summary judgment, the moving party bears the burden of proving that no genuine issue of material fact is in dispute, see Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and all evidence must be viewed in the light most favorable to the nonmoving party. See id. at 587, 106 S.Ct. 1348. Once the movant has carried its initial burden, then the nonmoving party "must come forward with 'specific facts showing there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)) (emphasis omitted); see also Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (holding that the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial).

### Defendants' Motion for Summary Judgment

A. Qualified Immunity [18]

■] Defendants LaRose, Clemens, and Freas first argue that they are entitled to qualified immunity. "Because the qualified immunity doctrine provides the official with immunity from suit, not simply trial, ... the district court should resolve any immunity question at the earliest possible stage of the litigation." Orsatti v. New Jersey State Police, 71 F.3d 480, 483 (3d Cir.1995) (citing Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) and Anderson v. Creighton, 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

■ "[G]overnment officials performing discretionary functions[ ] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818, 102 S.Ct. 2727;[19] see also Mitchell v. Forsyth, 472 U.S. 511, 528, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)(holding that officials are immune unless "the law clearly proscribed the actions" they took). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action," Creighton, 107 S.Ct. at 3038 (1987)(quoting Harlow, 457 U.S. at 819, 102 S.Ct. 2727), based on the information the official actually possessed at the time. Id. 107 S.Ct. at 3040.

17. After the deadline for the filing of summary judgment motions passed, plaintiffs' counsel expressed an interest in filing a motion for summary judgment, but apparently chose not to file a motion because it was untimely. Upon a review of defendants' motion for summary judgment and plaintiffs' response, and in view of the absence of any material facts in dispute, we granted plaintiffs leave to file a motion for summary judgment as to liability only. See Open Inns v. Chester County Sheriff's Department, Civ. No. 97–4822 (E.D.Pa. Sept. 22, 1998).

18. Defendants LaRose, Clemens, and Freas all argue that they are protected by qualified immunity. As noted above, Sheriff Erling has been sued only in his official capacity. Thus, the suit against him is essentially a suit against the county. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (holding that a suit against a "state official in his or her official capacity is not a suit against the official but rather is a suit against the

official's office"); Monell, 436 U.S. at 690 n. 55, 98 S.Ct. 2018 (holding that official capacity claims "generally represent only another way of pleading an action against an entity of which an officer is an agent"). The county is not entitled to assert qualified immunity. See Owen v. City of Independence, 445 U.S. 622, 650–53, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) (holding that government entities may not assert qualified immunity).

19. Government officials are accorded qualified rather than absolute immunity in order to accommodate two important interests: first, the officials' interest in performing their duties without the fear of constantly defending themselves against insubstantial claims for damages; and, second, the public's interest in recovering damages when government officials unreasonably invade or violate individual rights under the Constitution and laws of the United States. Orsatti, 71 F.3d at 483 (citing Creighton, 483 U.S. at 639, 107 S.Ct. 3034).

█] As we summarized this jurisprudence in *Wilkinson v. Bensalem Township*, 822 F.Supp. 1154 (E.D.Pa.1993):

When analyzing a claim of qualified immunity, we must "first ... identify the specific constitutional right allegedly violated, then ... inquire whether at the time of the alleged violation it was clearly established, then further ... inquire whether a reasonable person in the official's position would have known that his conduct would violate that right." *Collinson*, 895 F.2d at 998 (Phillips, J., concurring). The first two prongs of this inquiry are pure questions of law for the court to decide. *See id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 637–43, 107 S.Ct. 3034, 3038–40, 97 L.Ed.2d 523 (1987)); *Mitchell v. Forsyth*, 472 U.S. 511, 535 n. 12, 105 S.Ct. 2806, 2820 n. 12, 86 L.Ed.2d 411 (1985). The third prong is an application of *Harlow*'s objective standard, which sometimes requires courts to make factual determinations concerning a defendant's conduct and its circumstances, but ultimately it, too, devolves into a matter of law for the court. *See Collinson*, 895 F.2d at 998 (Phillips, J., concurring); *Creighton*, 483 U.S. at 646 n. 6, 107 S.Ct. at 3042 n. 6.

*Id.* at 1157. *See also Sharrar v. Felsing*, 128 F.3d 810, 826–28 (3d Cir.1997) (holding that in deciding whether officers are entitled to qualified immunity, it is not only the evidence of "clearly established law" that is for the court, but also whether a reasonable officer could have believed that his or her conduct was lawful, in light of the information the officer had).

█ Where a defendant asserts a qualified immunity defense in a motion for summary judgment, the plaintiff bears the initial burden of showing that the defendant's conduct violated some clearly-established constitutional or statutory right. *See Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir.1997).

Only if the plaintiff carries this initial burden must the defendant then demonstrate that no genuine issue of material fact remains as to the "objective reasonableness" of the defendant's belief in the lawfulness of his actions. *See id.* Thus, we begin with the predicate question of whether plaintiffs' allegations are sufficient to establish a violation of a clearly-established constitutional right.

Defendants concede that the Pennsylvania Superior Court in 1986 found the Commonwealth's distraint for rent statute (which permits a landlord to levy on property on a tenant's premises without prior notice or a hearing) to be in violation of the Fourteenth Amendment. *See* Defendants' Memorandum at 7 (citing *Allegheny Clarklift, Inc. v. Woodline Industries of Pennsylvania Inc.*, 356 Pa.Super. 269, 514 A.2d 606 (Pa.Super.1986)).[20] Defendants nevertheless contend that "the fact that Cignature Hospitality may have operated pursuant to an invalid statute or ambiguous contractual provision, does not translate into liability for the individual Defendants unless an objectively reasonable deputy sheriff would have known that service of a complaint, followed by two hours of preserving the peace while, as far as the individual Defendants knew, the plaintiff-landlord undertook to enforce its rights under the lease, was ... unconstitutional." *Id.* at 8.

Thus, defendants appear to concede that plaintiffs have satisfied the first two prongs necessary to defeat a qualified immunity defense because plaintiffs have (1) invoked a specific constitutional right which was violated; and (2) demonstrated that the constitutional right was clearly established at that time. While defendants in their summary judgment motion appear eager to jump to the third prong of a qualified immunity analysis, the "objective reasonableness" of the belief that their actions were lawful, we must

---

**20.** Defendants may have conceded too much. The Pennsylvania Supreme Court has not yet determined whether self-help eviction for non-payment of rent is a permissible remedy for a landlord under Pennsylvania law. There are, however, several Common Pleas Court decisions which hold that such a remedy is not appropriate on public policy grounds. *See, e.g., Paster v. Henry*, Civ. No. 94–4800, 1995 WL 3674 at *4 (E.D.Pa. Jan.4, 1995) (citing such cases). Even absent a decision from the Pennsylvania Supreme Court, we find that pertinent statutory and case law is inconsistent with an objectively reasonable belief in the propriety of this extra-judicial, self-help eviction. *See, e.g., Paster v. Henry*, Civ. No. 94–4800, 1995 WL 686038 at *2 (E.D.Pa. Nov.15, 1995)(denying qualified immunity).

first note that at the time of these events in August of 1995, the law in this area was even more "clearly established" than defendants appear willing to concede.

In *Soldal v. Cook County*, 506 U.S. 56, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992), mobile home park owners had begun civil proceedings to evict plaintiffs' trailer from the mobile home park, but forcibly evicted the trailer before obtaining a court order. At the park manager's request, deputies arrived during the eviction and told the trailer's owners that they were there to see that they did not interfere. Plaintiffs sued Cook County and its officers under 42 U.S.C. § 1983 for Fourth and Fourteenth Amendment violations. The Court of Appeals for Seventh Circuit held that there was no seizure under the Fourth Amendment, because it was not made in the course of "public law enforcement" and did not invade plaintiffs' privacy. *See* 942 F.2d 1073 (7th Cir.1991)(*en banc*). In reversing, a unanimous Supreme Court held that "seizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the [Fourth] Amendment has taken place." 113 S.Ct. at 547. The Court explained:

> The Court of Appeals' effort is both interesting and creative, but at bottom it simply reasserts the earlier thesis that the Fourth Amendment protects privacy but not property. We remain unconvinced and see no justification for departing from our prior cases. In our view, the reason why an officer might enter a house or effectuate a seizure is wholly irrelevant to the threshold question whether the Amendment applies. What matters is the intrusion on the people's security from governmental interference. Therefore, the right against unreasonable seizures would be no less transgressed if the seizure of the house was undertaken to collect evidence, verify compliance with a housing regulation, effect an eviction by the police, or on a whim, for no reason at all. As we have observed on more than one occasion, it would be "anomalous to say that the individual and his private property are fully protected by

the Fourth Amendment only when the individual is suspected of criminal behavior." *Id.* at 547–48 (citations omitted).

In their memorandum, defendants argue that while *Soldal* creates a cause of action for these plaintiffs under the Fourth and Fourteenth Amendments, the Court in *Soldal* did not address the issue of qualified immunity or the reasonableness of the officers' belief that their conduct was lawful. We turn, therefore, to an analysis of the objective reasonableness of the defendants' beliefs in the lawfulness of their actions.

Defendants contend that, as agents of the Sheriff, they are authorized by statute and by court rule both to serve process in civil proceedings as well as to act as peace officers in situations where trouble may arise. *See* Defendants' Memorandum at 8–10 (citing statutory and case law authority). As to the serving of process, defendants argue that while a request for serving process late at night was "out of the ordinary," *see* LaRose Dep. at 24, it was not unusual and would allow service to be accomplished with minimum inconvenience to the hotel guests. *See* Defendants' Memorandum at 8–9. Similarly, defendants claim that they had a legitimate reason to remain at the Lionville Holiday Inn after the civil complaint was served in order to prevent any potential breach of the peace. *See id.* at 9–10.

Viewing the record in the light most favorable to the defendants, we find that these actions or beliefs cannot be "objectively reasonable". These defendants, while following a regular custom and practice of the Chester County Sheriff's Department, *see infra* at 31–51, went far beyond the ministerial act of serving process or doing their common law duty of keeping the peace. As noted above, Lieutenant LaRose, the supervisor of the civil unit and a nineteen-year veteran of the Chester County Sheriff's Department, authorized two of his officers to work for a private attorney for up to six hours of overtime each, beginning at one o'clock in the morning. LaRose did not ask Carr's attorney any questions about why he wanted to serve a complaint late at night or why he needed the officers for such a long time.[21]

---

21. In his deposition, LaRose testified that he

"probably" was told that a repossession of the

Instead, he advised the officers that they might be required to remain on the premises after they served the complaint and told them to go to Carr's office to get their instructions.

As directed, Clemens and Freas met Carr at 1:00 a.m. at Carr's office. When Clemens and Freas were informed that they were serving process and would be required to remain on the premises while a repossession took place, both officers consented. Neither officer asked Carr nor his lawyers whether they had any legal authority to undertake such a seizure. Furthermore, both officers admit that they knew that there was no writ or order authorizing Carr's actions. Clemens and Freas, like LaRose, thus followed the county's don't ask, don't think policy, wilfully blinding themselves with the rationalization that they were simply there to serve process and keep the peace.

At 3:00 a.m. the Clemens- and Freas-led posse drove to the hotel. Along the way, Freas notified the Uwchlan Township Police Department, thereby assuring that plaintiffs had no chance of resisting the self-help repossession that was about to occur.

At about 3:20 a.m. Clemens and Freas entered the hotel with Carr's crew. After serving the complaint, Clemens and Freas stepped away from the counter, allowing Carr and his lawyers to move in, seize the hotel, fire the staff, and begin taking inventory of supplies. There is no doubt that the presence of Clemens and Freas gave the repossession a cachet of legality that had the (doubtless desired) effect of intimidating plaintiffs' staff and, thus, facilitated the repossession and converted it into state action. See, e.g., Booker v. City of Atlanta, 776 F.2d 272, 274 (11th Cir.1985); Paster v. Henry, Civ. No. 94–4800, 1995 WL 686038 at * 1 (E.D.Pa. Nov.15, 1995)(citing cases).

Clemens's and Freas's involvement was neither brief nor passive. In the two hours after the initial seizure, they remained on the

premises at the request of Carr's attorney. While Freas remained posted in the lobby of the hotel, Clemens admits that he (1) made periodic "rounds" between the kitchen, the bar, and the lobby, (2) assisted one of Carr's employees in undertaking an inventory of a freezer, and also (3) helped notify plaintiffs' employees about the seizure. Finally, Clemens and Freas did not leave the hotel until 5:30 a.m., when Carr's counsel "relieved" them.

Defendants cite several cases in which courts found police officers qualifiedly immune when a private party engaged in self-help repossession. These cases are readily distinguishable. For example, in Cofield v. Randolph County Commission, 90 F.3d 468 (11th Cir.1996), a divided panel of the Eleventh Circuit held that the "officer's mere presence during a lawful repossession is of no moment ... [and] would not even constitute state action sufficient to give the court subject matter jurisdiction." Id. at 471 (emphasis added). In that case, not only was the repossession of plaintiffs' car lawful, but it was already completed by the time that plaintiffs had any contact with the police officer. See id. at 471–72. In addition, the Court noted that the events that gave rise to the lawsuit occurred before Soldal. Therefore, a divided Eleventh Circuit reasoned that the rights at issue in the case were not "clearly established" at the time that the seizure occurred. See id. at 471 n. 5. Unlike Cofield, the events giving rise to this lawsuit occurred more than two years after the Supreme Court decided Soldal.

Similarly, in Haverstick Enterprises, Inc. v. Financial Federal Credit, Inc., 32 F.3d 989 (6th Cir.1994), the Sixth Circuit held that a police officer's presence at the site of a lawful statutory repossession of a truck entitled the officer to qualified immunity. In Haverstick, where the events also occurred before Soldal, the police officer was dispatched on "civil standby" to observe and monitor a lawful repossession.[22] The court

hotel was going to take place after the service of process was completed, but he could not specifically recall. See LaRose Dep. at 42–44.

22. The Michigan "self-help" statute, M.C.L.A. § 440.9503, provides in pertinent part: "Unless

otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action." Haverstick, 32 F.3d at 992 n. 2.

found that the officer acted in good faith when he briefly questioned plaintiff for an official report he was preparing, and their interaction lasted no longer than five minutes. *See id.* at 992–93.

By contrast, defendants here actively participated in an illegal seizure over the course of two hours, with the approval of their supervisor and as part of a regular custom or practice. In accordance with that policy, no officer asked whether there was the slightest basis for the seizure, such as a writ, a court order, or statutory authority.

Finally, defendants rely on *Apostol v. Landau,* 957 F.2d 339 (7th Cir.1992), another pre-*Soldal* opinion,[23] in which a divided panel of the Seventh Circuit held that defendants were entitled to qualified immunity because they passively stood by while a court order was served and executed. While it later turned out that the execution of the court order was illegal, the court held that the officers were entitled to qualified immunity because the authority of the court order appeared to be valid on its face, the officers had been informed that the recipient of the order might become violent upon its service, and the officers did not participate in the search. *See id.* at 342.

Once again, unlike *Apostol,* here no court order was presented. The officers never asked if there even was an order. There was no hint before service of the complaint that any person being served might become violent. In short, the officers' conduct here bears no resemblance to the seizure in *Apostol.* Accordingly, as we find the individual defendants not to enjoy qualified immunity, we proceed past that threshold.

**B.** *Eleventh Amendment Immunity*

█ Finally, defendants argue that Sheriff Erling is entitled to summary judgment because he is a state policymaker under the logic of *McMillian v. Monroe County,* 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997). In *McMillian,* the Supreme Court held that, in Alabama, sheriffs executing their law enforcement duties act as state

policymakers, rather than county officials, and therefore are not liable under § 1983. The Court explained in *McMillian,* however, that whether a sheriff is a state or county policymaker depends on the local government laws of the particular state. *See id.* at 1741–42.

In contrast to the Alabama Constitution, the Pennsylvania Constitution explicitly states that sheriffs are county officers. *See* Pa. Const. Art. IX, § 4 ("County officers shall consist of ... sheriffs"). Furthermore, in his deposition, Sheriff Erling testified that he was elected in municipal elections, *see* Erling Dep. at 6, and is paid by Chester County. *See id.* The Sheriff's budget comes from Chester County. *See id.* at 8–9. Accordingly, we reject defendants' contention that Sheriff Erling is a state policymaker. *See Morgan v. Rossi,* Civ. No. 96–1536, 1998 WL 175604 at * 12 (E.D.Pa. Apr.15, 1998) (holding that the Lehigh County Sheriff is a county officer rather than a state officer); *see also Reid v. Hamby,* Civ. No. 95–7142, 1997 WL 537909, at *7 (10th Cir. Sept.2, 1997); *Hamilton v. Stafford,* Civ. No. 96–265, 1997 WL 786768, at *5 (N.D.Miss. Nov.26, 1997); *Hernandez v. County of DuPage,* Civ. No: 96–8030, 1997 WL 598132, at *8 (N.D.Ill. Sept.19, 1997).

Defendants' motion for summary judgment thus has no merit, and we shall deny it.

*Plaintiffs' Motion for Summary Judgment*

In response to plaintiffs' motion for summary judgment, defendants have filed only an eight-sentence response, which we reproduce in full:

Defendants have never conceded that Plaintiffs' constitutional rights were violated. The record does not indicate whether or not Cignature Hospitality violated the Plaintiffs' "rights" under the terms of the lease agreement between them or because of some other action or inaction on the part of Cignature. Defendants' position is that, even if Plaintiffs are correct asserting that Cignature's activities on August 26, 1995, constitute an unlawful distraint, that action or inaction does not impose liability upon

---

**23.** The court in *Apostol* stated that there was no clear authority in force at the time of the incident giving rise to the lawsuit. *See Apostol,* 957 F.2d at 342.

the Defendants. Plaintiffs can point to no rule of court, statute or law that prohibits service [of] a complaint after "normal business hours". Plaintiffs' employees called their superiors, awaited their arrival and decided what to do independent of any action or words by Defendants. While on site, the Deputy Sheriffs and Uwchlan Township police officers acted in a reasonable manner and without any reason to suspect any unlawful activity was taking place. The record is void of any evidence or facts from which any inference of arbitrary or capricious government action is suggested. There is no allegation and no indication of any action motivated by bias, bad faith or deliberate and arbitrary abuse of power on the part of the Defendants. Defendants' Response to Plaintiffs' Motion for Summary Judgment.

As defendants' response contains pure legal argument, and fails to raise any material issues of fact for trial, we will for the reasons set forth below grant plaintiffs' motion for summary judgment as to liability only. *See supra* at 418 (explaining that once the movant has carried its Rule 56 initial burden, the nonmoving party must come forward with "specific facts" showing there is a genuine issue for trial).

### A. *Liability Under § 1983*

 In order to recover under § 1983, plaintiffs must plead and prove two essential elements. First, there must be a deprivation of plaintiffs' "rights, privileges, or immunities secured by the Constitution and laws" of the United States. *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).[24] Second, plaintiffs must prove that defendants deprived them of these rights under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory. *See Monroe v. Pape,* 365 U.S. 167, 171–88, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).[25]

### B. *Fourth Amendment Liability*

Plaintiffs' main contention here is that defendants violated their Fourth Amendment rights, as made applicable to the states through the Fourteenth Amendment, when the officers acted in concert with private parties to assist in the illegal seizure of the Lionville Holiday Inn on August 26, 1995.[26] The Supreme Court has long recognized that the Fourth Amendment's prohibition of unreasonable searches and seizures is applicable to commercial premises as well as to private homes. *See New York v. Burger,* 482 U.S. 691, 699, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (citing *See v. City of Seattle,* 387 U.S. 541, 543, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967)). "An owner or operator of a business thus has an expectation of privacy in com-

---

**24.** Section 1983 is not in itself a source of substantive federal rights. *See, e.g., Albright,* 114 S.Ct. at 811. Instead, a plaintiff must plead and prove a violation of a particular federal right. *See, e.g., Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 2370, 129 L.Ed.2d 383 (1994)(explaining that § 1983 creates a "species of tort liability").

**25.** In this case the "color of state law" requirement does not appear to be contested. It is undisputed that the defendants acted at all times in their duties as employees of the Chester County Sheriff's Department. Furthermore, while acting in their official capacity, private parties hired the officers for up to six hours each to serve process and then to remain on the premises while an illegal seizure took place, until they were informed by the private parties that they could leave. Such active involvement by the officers, pursuant to a regular custom or practice of the Chester County Sheriff's Department,

clearly meets the "color of state law" requirement. *See Soldal,* 113 S.Ct. at 543 (finding state action). *See also Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 941, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)("We have consistently held that a private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a 'state actor' "); *Dennis v. Sparks,* 449 U.S. 24, 27–28, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980); *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993); *Bendiburg v. Dempsey,* 909 F.2d 463, 468 (11th Cir.1990); *United Steelworkers of America v. Phelps Dodge Corp.,* 865 F.2d 1539, 1540 (9th Cir.1989); *Sims v. Jefferson Downs Racing Ass'n, Inc.,* 778 F.2d 1068, 1076 (5th Cir.1985).

**26.** The Fourth Amendment provides, in relevant part, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.

mercial property, which society is prepared to consider to be reasonable." *Id.*[27]

■ To prove a claim under the Fourth Amendment, a plaintiff must show that defendants' actions (1) constituted a "search" or "seizure" within the meaning of the Fourth Amendment, and (2) were "unreasonable" in light of the surrounding circumstances. *See, e.g., Brower v. County of Inyo,* 489 U.S. 593, 595–600, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989)(affirming two-fold analysis); *Fox v. Van Oosterum,* 987 F.Supp. 597, 607 (W.D.Mich.1997).[28]

■ Turning to the first prong, the Supreme Court has held that a "seizure" of property occurs when " 'there is some meaningful interference with an individual's possessory interest in that property.' " *Soldal,* 113 S.Ct. at 543 (quoting *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)). Cignature's repossession of the hotel, with defendants' active aid and assistance, constitutes a "seizure" within the meaning of the Fourth Amendment. *See, e.g. Soldal,* 113 S.Ct. at 543 ("As a result of the state action in this case, the Soldals' domicile was not only seized, it literally was carried away, giving new meaning to the term 'mobile home.' ").

■ As to "reasonableness," the Supreme Court has stated that "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). According to *Soldal,* in determining whether a government seizure violates the Fourth Amendment, the seizure must be examined for its overall reasonableness. *See Soldal,* 113 S.Ct. at 549 (" 'reasonableness is still the ultimate standard' under the Fourth Amendment") (citations omitted). The analysis must be based upon a careful balancing of governmental and private interests. *See id.*

## C. *Individual Officers' Liability*
### 1. *Clemens and Freas*

■ As noted above, the actions of officers Clemens and Freas on August 26, 1995 were not reasonable, and no reasonable jury could find otherwise. *See supra* (holding that defendants are not entitled to qualified immunity). While we recognize that there is a legitimate governmental interest in serving process in civil suits and also in keeping the peace, we find that the officers' actions here, done pursuant to the don't ask, don't think policy, were unreasonable.

A private party in essence rented the badges of Chester County between 1:00 a.m. and 5:30 a.m. on August 26, 1995 and county officers actively participated in an illegal and massive self-help repossession without so much as questioning the legal authority for such extreme and protracted actions. While the Supreme Court in *Soldal* stated that a finding of unreasonableness in Fourth Amendment seizure cases would be a "laborious task" because often officers will be acting pursuant to a court order, *see Soldal,* 113 S.Ct. at 549, here the officers actively assisted a private party in undertaking an illegal seizure without an order, a writ, a warrant, or any statutory authority. Such actions are precisely the type of unreasonable behavior that the Fourth Amendment forbids. Accordingly, we will grant plaintiffs' motion for summary judgment as to liability against officers Clemens and Freas in their individual capacities.

### 2. *Supervisory Liability*

■ A defendant in a § 1983 action must have some causal connection to the alleged wrongdoing. *See Mark v. Borough of Hatboro,* 51 F.3d 1137, 1152–54 n. 13 (3d Cir.1995). In order to render a supervisor personally liable, plaintiffs must show that he (1) participated in violating their rights, or (2) directed others to violate them, or (3) as the person in charge, had knowledge of and acquiesced in his subordinates' violations, or (4) tolerated past or ongoing misbehavior.

---

**27.** There is no contention that defendants here were conducting an administrative inspection of a "closely regulated" industry, a circumstance which would change the analysis. *See id.*

**28.** As *Soldal* made clear, the Fourth Amendment protects property interests as well as expectations of privacy. *See Soldal,* 113 S.Ct. at 543.

See *Baker v. Monroe Township*, 50 F.3d 1186, 1190–91 (3d Cir.1995) (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir.1990); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.1988)). Lieutenant LaRose, while pursuing a regular custom or practice of the Chester County Sheriff Department, *see infra*, indisputably had "actual knowledge and acquiescence" of the activities of officers Clemens and Freas on August 26, 1995. *See id.* at 1194 (citations omitted).

 As noted above, Lieutenant LaRose rented out two of his officers to a private party for up to six hours of overtime each beginning at one o'clock in the morning. LaRose did not question the lawyer as to why he needed to serve process at that hour, or why he needed up to six hours of overtime. LaRose gave no instructions to his officers other than that they might be required to remain on the premises after service was accomplished. LaRose simply told Clemens and Freas to meet at the lawyer's office to get their instructions, in accordance with the don't ask, don't think policy.

In his deposition, LaRose testified that he "probably" was told that a repossession of the hotel was going to take place after service of process was completed. *See* LaRose Dep. at 42–44. Rather than ask any further questions, LaRose turned a blind eye to the events that were about to unfold, and instead facilitated the events by authorizing the overtime and sending his officers into the field without any instructions. LaRose thus had actual knowledge of the activities of Clemens and Freas, and acquiesced in their actions because it was part of a regular practice of the Sheriff's Department both to assist in serving process in civil cases and in keeping the peace during repossessions, without asking any questions about the legal authority for such actions. *See infra.* Accordingly, we

will grant plaintiffs' motion for summary judgment as to liability against Lieutenant LaRose in his individual capacity.

**D. *Municipal Liability*** [29]

 In determining whether a government entity may be held liable under § 1983, the Supreme Court has made it clear that liability may not be founded under the doctrine of *respondeat superior*, but rather only upon evidence that the governmental unit itself supported a violation of constitutional rights. *See Monell*, 436 U.S. at 691–95, 98 S.Ct. 2018. Thus municipal liability attaches only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694, 98 S.Ct. 2018.

 The Court's holding and reasoning in *Monell* have created a two-path track to municipal liability under § 1983, depending on whether the allegation is based on municipal policy or custom. *See Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir.1996). In *Andrews v. City of Philadelphia*, 895 F.2d 1469 (3d Cir.1990), our Court of Appeals articulated the distinction between these two sources of liability:

> A government policy or custom can be established in two ways. Policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issues an official proclamation, policy or edict. A course of conduct is considered to be a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well-settled" as to virtually constitute law.

*Id.* at 1480 (citations omitted).[30]

 In either instance, a plaintiff must show that an official who has the power to

---

**29.** As noted earlier, we will dismiss plaintiffs' claims against the Chester County Sheriff's Department as an improper defendant. *See supra.* As plaintiffs have sued all of the remaining defendants in their official capacities, however, plaintiffs have in essence sued Chester County. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (holding that a suit against a "state official in his or her official capacity is not a suit against the official but rather is a suit against the official's

office"); *Monell*, 436 U.S. at 690 n. 55, 98 S.Ct. 2018 (holding that official-capacity claims "generally represent only another way of pleading an action against an entity of which an officer is an agent"). Therefore, in analyzing plaintiffs' official-capacity claims against the defendants, we will apply the standards for municipal liability.

**30.** Custom may be evidenced through knowledge and acquiescence, *see Beck*, 89 F.3d at 971 (cit-

make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom. *See Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir.1990). This does not mean, however, that the responsible decisionmaker must be specifically identified by the plaintiffs' evidence. *See id.* Practices " 'so permanent and well settled' as to have the 'force of law' [are] ascribable to municipal decisionmakers." *Id.* (citations omitted).[31]

■ There is little doubt the Chester County Sheriff's Department has long maintained a don't ask, don't think policy. The deposition testimony of the defendants is telling on this point, and bears quotation at length.

Consider first the testimony of Lieutenant LaRose. The lieutenant, a nineteen-year veteran of the Chester County Sheriff's Department and the head of the Civil Unit, forthrightly admitted every detail of the don't ask, don't think policy:

Q. ... Is there a policy, regulation, rule, or custom of the Chester County Sheriff's Department that requires you or permits you to authorize overtime at the request of a private attorney?

A. Yes.

Q. Okay. Is that a written policy?

A. No.

Q. If you tell me how that—tell me the form of that rule or regulation. Is it a rule?

A. No, it's not a rule. It's a courtesy-type thing. If you were to come in and say, "This couple works in the city all today, they're not home until 6:30 at night, would you go out and serve this at 7:00 o'clock," sure.

Q. Okay.

A. Sure I'll do that.

Q. But it is your testimony that it is the policy and custom of the Sheriff's Department to authorize overtime at the request of a private attorney?

A. Mm-hmm.

Q. And it is the policy and custom of the Sheriff's Department to permit service at the time requested—

A. Yes.

Q. —by the private attorney?

A. Yes.

Q. And that is regardless of the circumstances?

A. Yes.

LaRose Dep. at 49–50.

Q. ... It's a regular practice, then, to permit service at the time requested by the attorneys?

A. Yes.

Q. And it is a regular practice for attorneys to request that the deputies remain with them while they take possession of something?

A. Mm-hmm.

Q. Okay. And they pay for that time?

A. Yes.

Q. So, is it accurate to say, basically, that the Chester County Sheriff's Department—you can disagree with this characterization, but I'm almost understanding this to be a situation where you will actually rent your officers to private attorneys.

---

ing *Fletcher v. O'Donnell,* 867 F.2d 791, 793 (3d Cir.1989)), or "may be inferred from omissions and informal acts." *Freedman v. City of Allentown,* 853 F.2d 1111, 1116 (3d Cir.1988) (citations omitted).

**31.** For example, in *Bielevicz,* the plaintiffs alleged a violation of § 1983 against the City of Pittsburgh for a municipal custom of allowing police to make illegal arrests for intoxication.

Our Court of Appeals held that to sustain a § 1983 claim for municipal liability the plaintiff "must simply establish a municipal custom coupled with causation—i.e., that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury." *Bielevicz,* 915 F.2d at 851.

A. Sure.

LaRose Dep. at 70–71.

Q. ... Do you require a court order? Would there—would you need a court—

A. Are you asking me if I require a court order for us to take possession of something?

Q. No, for you to accompany—

A. No.

Q. No court order, okay. So, in other words, you believe that the Sheriff's Department is authorized and it is within their official duties to go with a party while they take possession if that possession is being taken pursuant to a contract term as opposed to a court order; correct?

A. If it entails keeping the peace, yes.

Q. Does it matter if their taking possession is legal or unlawful?

A. We wouldn't know that. We're not lawyers.

Q. Okay. So, you will do this without knowing whether the taking of possession is lawful or not?

A. That's—that's an attorney's call on that. It wouldn't be our call. I mean, if we had to make those calls, we'd have to go to law school.

Q. I'm asking you, you would not make that determination?

A. No, no.

Q. And is that the custom and practice of the Sheriff's Department?

A. I would say so.

Q. Has this been something that has occurred in the Sheriff's Department that you can recall?

A. What are you talking about? What's "this"?

Q. Accompanying people to take possession—

A. Oh, yeah, sure.

Q. And that's with or without court order?

A. I would say so, yeah. We take a lot of horses, and I can't recall how we do it

right offhand. But this is horse country and—

Q. But that's a regular practice?

A. It's a regular—yeah.

LaRose Dep. at 58–60.

Q. Is there any procedure at all within the Sheriff's Department that tells you under what circumstances service can be made late at night or early in the morning or under what circumstances you can comply with a private attorney's request?

A. Mm-hmm. There's nothing per se, but you have to use discretion, like any intelligent human being would do.

Q. Okay. Have you ever refused, that you recall?

A. Let me think. I have to say that I have, but in doing so, I make them write it.

Q. I'm not sure what you mean.

A. If you know that if an attorney—and this happens. If I know that an attorney is asking me to do something that is clearly against the rules, I will object. But, then, I've had them come back and say, "I'm telling you to do it, you have to do it." I will make them write it out, that they are instructing me to do it and that I have informed them that it's against the rules.

Q. And, then, you will proceed to do it?

A. Sure, oh, yeah.

Q. Even though you believe it to be against the rules?

A. Right. I take myself off the hook and I follow the directions of the court.

Q. Well, are you saying it's the attorney who tells you to do it or he presents you with a court order telling you to do it?

A. The attorney, if I'm not mistaken, is an officer of the court.

LaRose Dep. at 32–33.

Q. So, my understanding, then, is that it is your understanding that the official duties of the Sheriff's Department is

not just the service of process; correct?

A. Right.

Q. And, basically, the official duties of the Sheriff's Department is anything that an attorney requests that you do—

A. Or a judge....

LaRose Dep. at 53.

Sergeant Clemens, a ten-year veteran of the Chester County Sheriff's Department, was equally explicit and unqualified in his description of the don't ask, don't think policy:

Q. Okay. I'm asking you whether you believe it's part of your official duties and within your legal authority to take directions from private attorneys in connection with your service of process, a complaint concerning how long you were to remain on the premises.

In other words, in this matter, you testified that you intended to stay until Carr's attorney relieved you; is that correct?

A. Yes, that was my understanding.

Q. I'm asking you that if it was your belief that it was within your legal authority and your official duties to do that, to take directions from a private attorney concerning when you can leave the premises.

A. I would say yes. There was arrangements that were already made.

Q. Now, based upon what was your belief that this was within your official duties? What was the basis for that belief, that it was within your authority and your official duties?

A. To stay there?

Q. Yes.

A. To keep the peace as he wished. Maybe we're not—

Q. Yeah, I'm asking—you clearly believed, according to your testimony, that remaining there at Mr. Carr's attorney's request until he told you to leave was within your official duties.

A. Yes.

Q. And you clearly believed you were authorized by law to do that; correct?

A. Yes.

Clemens Dep. at 76–77.

Q. You're not aware of any policy, custom, or regulation of the department that permits you or requires you to remain on the premises while this is happening?

A. No.

Q. Okay. Is it a regular practice?

A. Yes.

Q. So, it is a regular practice of the Sheriff's Department to remain on premises—

A. That is correct.

Q. —while a private party takes possession of property?

A. Well, I don't know if I'd say private—well, private party or their counsel, a lot of times.

Q. Okay. And that's regardless of whether there's a court order or not that's directing you to take possession?

A. True.

Q. Okay.

A. Yes.

Q. So, it's at the act of the attorney, not any court order that makes you remain?

A. Correct.

Clemens Dep. at 71–72.

Q. How about a policy, common policy of the Sheriff's Department to remain on the premises after serving a complaint at the request of private counsel until they relieve you?

A. Is it written policy?

Q. No. Is it a common practice or—

A. Yes, common practice, not policy.

Q. Unwritten policy?

A. Yes.

Q. That's regardless of the circumstances?

A. Yes.

Q. So, is it your testimony that it was in accordance with the common practice and policy of Chester County Sheriff's

Department to remain there while Mr. Carr took possession, even though you had no court order requiring you to take possession?

A. This is what the attorney wished and it was prearranged.

Q. My question is, sir, your understanding and your testimony that that's a common practice of the Chester County—

A. Yes.

Clemens Dep. at 79–80.

Deputy Sheriff Freas, a twelve-year veteran of the Chester County Sheriff's Department who has worked approximately the past nine years in the civil unit, confirmed his colleagues' testimony:

Q. Are you aware of any state statute or regulation permitting or requiring you to stand by while this

occurred, to keep the peace?

A. I don't know of any—any statutes, no, regulations, no.

Q. Rule of court that requires you to stand by to keep the peace after a complaint has been

effectively served?

A. No.

Q. So, you didn't rely upon any state statute or regulation or any civil rule of court in

determining that it was your obligation to remain?

A. No.

Q. How about any policy, regulation, or rule of the Sheriff's Department, Chester County Sheriff's

Department, written or unwritten?

A. It has been a custom of the Chester County Sheriff's Department that, if either party had requested a deputy to remain on location, the deputy would remain there to keep the peace, to make sure no one got injured, whether it would be the plaintiff or the defen-

dant. So, you could say it was a custom.

Freas Dep. at 51.

Q. Okay. So, I guess my question is, then, is it the custom of the Chester County Sheriff's Department to follow that instruction of standing by regardless of what was actually transpiring; in other words, even if you are not there to serve a writ of possession—

A. Yes.

Freas Dep. at 52.

Finally, in his deposition, Sheriff Erling, the chief policymaker for the Chester County Sheriff's Department, *see* Erling Dep. at 24, did not controvert this testimony of LaRose, Clemens, or Freas. He confirmed that his officers are hired by private attorneys for overtime. *See id.* at 55. While he emphasized that his officers use their discretion in the field, the Sheriff confirmed that they did not necessarily consider whether the private party has lawful authority to take possession of private property because

> [t]hey would have no way of knowing whether the party has a lawful authority to take possession. If they were taking an illegal possession, then the desk clerk, CEO, manager, or someone else involved should have made some type of a request of our officers, who at that time would have contacted the local police department to say these people were stealing these items. . . . It's not up to them to determine whether or not the action being taken by them is lawful.

Erling Dep. at 64–65. Furthermore, Sheriff Erling confirmed that it was a custom or practice of his officers to take instructions from private parties as to when the officers could leave. *See* Erling Dep. at 66 ("Q. Is it the custom and policy of the Sheriff's Department to permit the sheriff's deputies when accompanying private parties and their attorneys, to take instructions from the private attorneys concerning when they can leave the premises? A. Yes.")

Thus, based upon defendants' testimony, we find that the Chester County Sheriff's Department has an admitted unconstitutional custom or practice of authorizing its officers,

at any hour of the day or night, to be hired by private parties to accompany and assist them in serving process in civil actions and then to remain on the premises at the behest (and expense) of the private parties while those private parties carry out seizures, without any inquiry into the legality of such actions, such as whether the seizures are taken pursuant to an antecedent court order or writ.

Our Court of Appeals has held that proof of the mere existence of an unlawful policy or custom is not enough to maintain a § 1983 action. The plaintiff bears the additional burden of proving that the municipal practice was the proximate cause of the injuries suffered. *See Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir.1996); *Bielevicz*, 915 F.2d at 850. To establish the necessary causation, a plaintiff must demonstrate a "plausible nexus" or "affirmative link" between the municipality's custom and the specific deprivation of the constitutional rights at issue. *See Bielevicz*, 915 F.2d at 850–51 (citing cases).

Plaintiffs here easily satisfy the causation requirements. But for the defendants' willingness in the words of Sergeant Clemens to "accommodate" private parties, *see* Clemens Dep. at 75, Cignature Hospitality and Raymond Carr simply could not have seized the Lionville Holiday Inn on August 26, 1995 with only a civil complaint for money damages in hand. It was the defendants' presence and active involvement in the illegal seizure which gave it both the appearance of legality and converted it into state action. In short, the Chester County Sheriff's Department's don't ask, don't think policy made these private parties' wee hour surprise takeover a resounding success.

Finally, it is not entirely clear under our Court of Appeals's jurisprudence what the standard of culpability is for this type of case. *See Beck*, 89 F.3d at 972 (explaining that the "deliberate indifference" standard has been applied in a variety of policy and custom contexts, but noting that in *Bielevicz* the court appeared to require only proof of a custom and causation). Applying the "delib-

erate indifference" standard here, we find that the Chester County Sheriff's Department's custom or practice—of authorizing its officers, at any hour of the day or night, to be hired by private parties to carry out seizures, without any inquiry into the legality of such actions—epitomizes the definition of "deliberate indifference." The County's rental of its official authority regardless of the circumstances is indifferent to the Constitution while it is deliberate to private interest.

*Conclusion*

While Lieutenant LaRose is correct that we cannot expect sheriffs or police to have the same level of legal knowledge as lawyers,[32] they must at a minimum make some general inquiry into the legality of private parties' actions before actively and at length presiding over seizures at those parties' behest. From making the briefest stop to ferreting out the most cunning fugitive, American law always expects law enforcement officers to engage their brains. That expectation does not change as the constabulary exercises its civil duties when constitutional interests are at stake. Officers cannot sell their judgment when they rent their badges.

Accordingly, we will enter summary judgment against all defendants in their official capacities.

---

**32.** LaRose dep. at 59 ("We're not lawyers.").